**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 26 2003**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

WINDEL RAY WORKMAN,

        Petitioner - Appellant,

v.

MIKE MULLIN, Warden,
Oklahoma State Penitentiary,

        Respondent - Appellee.

No. 01-6448

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CIV-97-1378-L)**

---

Robert W. Jackson (Steven M. Presson with him on the briefs), Jackson &
Presson, P.C., for Petitioner-Appellant.

David M. Brockman, Assistant Attorney General (W.A. Drew Edmondson,
Attorney General of Oklahoma, with him on the briefs), State of Oklahoma for
Respondent-Appellee.

---

Before **EBEL**, **BRISCOE**, and **HARTZ**, Circuit Judges.

---

**EBEL**, Circuit Judge.

---

Petitioner-Appellant, Windel Ray Workman, was convicted and sentenced to death by a jury in Oklahoma state court for felony first-degree child abuse murder. He petitions for a writ of habeas corpus for relief in federal court pursuant to 28 U.S.C. § 2254. He objects to his death sentence on the ground that, although the jury found that he had killed a child during the course of the felony of child abuse, the verdict did not sufficiently determine his degree of culpability as required by the Supreme Court cases of <u>Enmund v. Florida</u>, 458 U.S. 782, 798 (1982), or <u>Tison v. Arizona</u>, 481 U.S. 137, 157 (1987), such that the State may impose the death penalty on him. We AFFIRM the district court's dismissal of Workman's petition for a writ of habeas corpus. We hold that an additional culpability finding as might be required by <u>Enmund</u> or <u>Tison</u> in order to apply the death penalty for a felony murder conviction does not apply when the defendant actually killed his victim, as was the case here.

## BACKGROUND

Windel Ray Workman was tried by a jury in Oklahoma and convicted of the first-degree child abuse murder of his live-in girlfriend's two-year-old daughter. <u>Workman v. State</u>, 824 P.2d 378, 380 (Okla. Crim. App. 1991). The girl, Amanda Holman, was pronounced dead upon arrival at South Community Hospital in Oklahoma City on the morning of January 10, 1987. The emergency room doctor

and nurse who unsuccessfully attempted to revive Amanda observed numerous bruises on the girl's face, chest, back and buttocks, and suspected child abuse.

The police were called to the hospital and spoke with Workman about Amanda's injuries. Workman told them that Amanda had fallen backwards out of bed the night before. He also admitted to spanking the child hard, leaving bruises on her body. He played "pitch" with Amanda, in which he threw the girl up in the air and caught her. Amanda's pediatricians testified, however, that her injuries could not have resulted from these activities alone and she was not a child who bruised easily.

According to the medical examiner, Amanda had died from blunt head injury. Her death was a homicide, not a result of accident. Any of Amanda's three serious head injuries could have killed her, and he noted additional injury to the child's abdomen and buttocks. Moreover, because bruising cannot occur post-mortem, the injuries observed must have been inflicted before her death. Had Amanda's injuries been the result of a fall as Workman claimed, such a fall must have been from at least ten feet. The physician in charge of the emergency room at Children's Hospital revised upward the medical examiner's estimate of the height of a fall that could have inflicted similar injuries, concluding that such injuries might result from a fall from a two or three-story building. The doctor from the Children's Hospital also concluded that, on the basis of the autopsy

report, photos of Amanda, and discussions with the medical examiner, Amanda had been "most definitely" a victim of child abuse.

Witnesses established that Amanda had been in Workman's care during the time she incurred her injuries. Several employees of the child's daycare testified that they had noticed bruises and other injuries on Amanda in the days preceding her death. Amanda cried when Workman came to pick her up from the center.

January 7, 1987 was the last day that Workman picked Amanda up from daycare. On that day, the girl screamed and cried when she saw Workman at the door. She climbed into the lap of a stranger and wet her pants. Workman's comment about Amanda's behavior was that the child, for some reason, "doesn't like me."

Workman kept Amanda home by himself on January 8th and 9th. He testified that he heard Amanda fall in her room on the 8th and believed that she had hit a dresser. The two-year-old told him that her stomach hurt afterwards. On cross-examination, Workman admitted spanking Amanda on the 8th. According to Workman, on the 9th, Amanda fell again in the bathtub. Workman did not tell the police about this fall in initial interviews because he said he had left her unaccompanied at the time, in contravention to a promise he had made her mother. That evening, Amanda began to vomit. After Amanda could not be

resuscitated on the 10th, Workman and the girl's mother took her to the hospital, and she was pronounced dead on arrival.

Amanda's pediatricians testified that Amanda's mother had been a concerned parent, bringing Amanda in for treatment of even minor injuries. By contrast, Workman's own witness, his second wife, had seen Workman spank their daughter too hard two or three times, causing the child to wet her pants.

Procedural History

At trial, the state court retained a juror who first expressed doubt about whether she could serve, and then later agreed that she could be fair.

The jury convicted Workman of child abuse murder in the first degree.[1] The jury was instructed that the elements of the crime were (1) "The death of a human being;" (2) "That this human being was under the age of eighteen years;"

---

[1] Child abuse murder in Oklahoma is similar to felony murder in that it does not require a specific intent to kill. Malicoat v. State, 992 P.2d 383, 395 (Okla. Crim. App. 2000). Nevertheless, it is categorized as first-degree murder. Fairchild v. State, 998 P.2d 611, 618 (Okla. Crim. App. 1999); see also Okla. Stat. tit. 21, §843 (amend. 1989, 1990), renumbered as Okla. Stat. tit. 10, §7115 effective Nov. 1, 1995 (amend. 1995, 1996, 1998, and 1999) (Supp. 2003) ("'[C]hild abuse' means the willful or malicious abuse . . . of a child under eighteen (18) years of age by another, or the act of willfully or maliciously injuring, torturing or maiming a child under eighteen (18) years of age by another."); Okla. Stat. tit. 21, §701.7(c) (amend. 1989, 1997) ("It is sufficient for the crime of murder in the first degree that the person either willfully tortured or used unreasonable force upon the child or maliciously injured or maimed the child.").

(3) that "The death occurred as a result of the willful or malicious use of unreasonable force upon the child;" and (4) that these actions had been committed "By the defendant Windel Ray Workman." Jury Instruction No. 6. During the sentencing stage of Workman's trial, the jury found the existence of aggravating circumstances, including that the murder was "especially heinous, atrocious, or cruel," and recommended imposition of the death penalty. See Okla. Stat. tit. 21, §701.12(4).

On direct appeal, Workman challenged Oklahoma's first-degree murder statute as vague, and the jury instructions as not properly relaying to the jury the requirements of the statute. He also argued that the jury instructions were insufficient under the Eighth and Fourteenth Amendments because they allowed conviction without proof of mens rea for the killing, as opposed to mens rea for the commission of child abuse. Workman exhausted his state remedies on direct appeal. The Oklahoma state courts did not address the Eighth Amendment issue and denied relief.

On collateral attack in federal court, Workman argued for the first time that his trial counsel had a conflict of interest because the attorney represented his brother, Tracey Workman, on a separate charge.

He also renewed his objection that the jury instructions had not properly determined his degree of culpability for the child abuse murder and he more

explicitly referred to the standard for imposition of the death penalty under the Eighth Amendment cases of Enmund v. Florida, 458 U.S. 782, 798 (1982), and Tison v. Arizona, 481 U.S. 137, 157 (1987).

The district court found that Workman had properly presented his Eighth Amendment Enmund/Tison argument on direct appeal. It then ordered Workman to present the argument again to the Oklahoma state courts so that the Oklahoma courts could make a determination of Workman's Enmund/Tison culpability pursuant to the procedures outlined in Cabana v. Bullock, 474 U.S. 376 (1986).

The Oklahoma Court of Criminal Appeals (the OCCA), however, again refused to rule on the substance of Workman's Enmund/Tison argument, now claiming that it was procedurally barred, apparently predicated on the belief that the argument had not been raised on direct appeal.

When Workman's case returned to the federal system, however, the district court found that his Enmund/Tison claim was not procedurally barred as the OCCA had determined. The district court reiterated its earlier determination that Workman had raised the issue of Enmund/Tison culpability on direct appeal.

Because the OCCA declined to rule on the merits of Workman's Enmund/Tison claim even when presented with an additional opportunity to do so, the district court subsequently made the required determination on the issue of Workman's culpability itself. The district court found that, although there had

been no direct finding in the trial record that Workman had intended to inflict fatal blows to the child, the record contained "abundant circumstantial evidence of Petitioner's mental state." Slip Op. at 15. The district court surveyed the traumatic physical abuse done to Amanda Holman before her death, and noted that it was bound by the state court's determination that Workman had been the one who had inflicted the abuse. Given the evidence of the type of abuse presented at trial, the district court concluded that the record was "sufficient to demonstrate that Petitioner acted with reckless disregard of the consequence of his actions when he repeatedly struck [the two-year-old child] about the head and abdomen." Slip Op. at 16-17. This language satisfied the "reckless disregard" or "reckless indifference to the value of human life" standard in Tison v. Arizona. Tison, 481 U.S. at 157.

Now on appeal, Workman argues that his sentence should be overturned on five main grounds. First, he objects that his attorney had a conflict of interest that mandates reversal of his sentence. Second, he argues that his right to an impartial jury was unconstitutionally impaired by the retention of the juror who initially objected to serving. Third, Workman argues that his right to due process was unconstitutionally impaired by jury instructions that allegedly relieved the State of the burden of proving every element of the crime charged. Fourth, Workman argues that his sentence is unconstitutional because the definition of the

aggravating circumstance for murder was vague. Fifth, he argues that his sentence is unconstitutional due to cumulative error. Workman also has filed motions to have his case held in abeyance because of the Supreme Court's recent decision in Ring v. Arizona, 536 U.S. 584 (2002), and to remand his case for an evidentiary hearing.

We exercise jurisdiction over this appeal pursuant to 28 U.S.C. §§ 2253, 2254. For the reasons that follow, we AFFIRM the district court's denial of a writ of habeas corpus, we DENY the motion to hold the appeal in abeyance, and we DENY the petitioner's request to remand for an evidentiary hearing.

**DISCUSSION**

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), issues brought on petition for a writ of habeas corpus must have been exhausted in the state system. 28 U.S.C. § 2254(b). Federal courts may not issue a writ unless the state courts' adjudication of a claim was either "contrary to, or involved an unreasonable application of, clearly established [f]ederal law" or "resulted in a decision . . . based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding." 28 U.S.C. § 2254(d)(1) & (2). State court determinations of fact are "presumed to be correct"

unless a petitioner rebuts them with "clear and convincing evidence."  28 U.S.C. § 2254(e)(1).

Under extraordinary circumstances when a federal district court must make the initial determination of an issue because the state courts have not addressed the merits of a claim and there is no state procedural bar, we review the district court's conclusions of law de novo and its findings of fact for clear error. LaFevers v. Gibson, 182 F.3d 705, 711 (10th Cir. 1999).

## I.  Attorney Conflict of Interest.

We find that Workman's attorney did not have a conflict of interest that mandates reversal of his sentence.  Workman had argued that his Sixth Amendment right to counsel was violated because his attorney had also represented his brother, Tracey, on a separate charge after a search of their joint residence uncovered marijuana in Tracey's room.

A conflict of interest may be present even when an attorney's clients are not co-defendants if a petitioner can prove that the common representation adversely affected his attorney's performance.  United States v. Soto Hernandez, 849 F.2d 1325, 1328-29 (10th Cir. 1988) (common representation other than as co-defendants); United States v. Bowie, 892 F.2d 1494, 1500 (10th Cir. 1990) (burden of proof on petitioner).

But Workman did not raise this issue at trial or on direct appeal, and a conflict of interest claim brought for the first time on collateral attack is governed by the Supreme Court's standard under Cuyler v. Sullivan.[2]  446 U.S. 335, 347-48 (1980) ("[A] defendant who raised no objection at trial must demonstrate that an actual conflict of interest adversely affected his lawyer's performance."); Selsor v. Kaiser, 22 F.3d 1029, 1032 (10th Cir. 1994).

As the Court held in Cuyler, the mere possibility of conflict is insufficient to reverse a criminal conviction, at least when the conflict was not brought to the trial court's attention.  Cuyler, 446 U.S. at 350; see also United States v. Cook, 45 F.3d 388, 393 (10th Cir. 1995).  An actual conflict of interest exists only if counsel was "forced to make choices advancing . . . interests to the detriment of his client."  United States v. Alvarez, 137 F.3d 1249, 1251-52 (10th Cir. 1998) (citing Stoia v. United States, 22 F.3d 766, 771 (7th Cir. 1994)).  Furthermore, "the petitioner must be able to point to specific instances in the record" that suggest his interests were damaged for the benefit of another party.  Id. (quoting Danner v. United States, 820 F.2d 1166, 1169 (11th Cir. 1987)).

Workman attempts to list examples of when his interests were compromised by the attorney's representation of Tracey, but his assertions are strained and

_____

[2]  Because the state did not raise an issue of procedural bar, but instead engaged the Cuyler analysis directly, we do not address the question of whether procedural bar might have applied to Workman's conflict of interest claim.

counterintuitive. In each of Workman's examples, his interests appear not to have been damaged, but instead his interests may actually have been furthered by his attorney's actions.

First, Workman contends that his attorney should not have moved to suppress evidence of the drugs found in the house. He asserts that the presence of drugs in the house was a "nullity" as far as his case was concerned. But it certainly could not have helped Workman, on trial for murder already, for the jury to discover that he allowed drugs in the house with a two-year-old child.

Second, Workman contends that his attorney should have cross-examined Tracey on why he was angry with Workman. Yet the reason why Tracey was angry with his brother is that Workman had given consent for the search of the house during which police found the drugs. Had the attorney asked any questions in this vein, testimony about the drugs would have come in, and that would have hurt Workman.

Third, Workman contends that his attorney never suggested that Tracey could have harmed the child instead of himself. This theory of defense, however, would have contradicted Workman's own testimony that he was the only person looking after the child in the days leading up to her death and therefore that no one else could have injured the child. Workman told the police that the child had fallen several times in those days on his watch, and that he had been the only one

to witness her rapid decline. As the district court found then, "defense counsel's ability to effectively point the finger at others was severely limited by [Workman's] own position — not by any conflicting interests between Petitioner and his brother." Slip Op. at 19. Workman's attorney could thus only have done damage to the petitioner's credibility had he attempted this line of questioning.

Fourth, Workman contends that his attorney should not have argued in camera against the impeachment of Tracey's testimony through the introduction of past drug convictions. But again it was apparently against Workman's own interests for evidence of his brother's prior criminal record to be introduced because it would have made Workman, given his testimony, look like a poor caretaker to have allowed a two-year-old child to live in a household around such activities.

Workman's interests were not tangibly compromised in the attorney's representation of his brother. See generally Alvarez, 137 F.3d at 1252 ("Without a showing of inconsistent interests, any alleged conflict remains hypothetical [and will not support reversal]."). There is no "actual conflict" here as defined by the Supreme Court in Cuyler. We AFFIRM the district court's denial of a writ on this basis.

## II.    Retention of juror.

We hold that Workman's right to an impartial jury was not unconstitutionally impaired by the retention of a juror who first expressed doubt about whether she could serve, and then later agreed that she could be fair.

The Tenth Circuit has specifically held that federal courts may only reverse state court determinations of juror impartiality upon a showing of "manifest error."[3]  Brecheen v. Reynolds, 41 F.3d 1343, 1350 (10th Cir. 1994); see also Cannon v. Gibson, 259 F.3d 1253, 1280 (10th Cir. 2001) (deferring to a trial judge's finding as to whether a potential juror is biased unless the finding is rebutted by clear and convincing evidence); accord Sallahdin v. Gibson, 275 F.3d 1211, 1224 (10th Cir. 2002).  This limited degree of review is justified by a trial judge's unique advantage in observing and evaluating the demeanor of jurors. Brecheen, 41 F.3d at 1350 (quoting Church v. Sullivan, 942 F.2d 1501, 1519 (10th Cir. 1991)).

---

[3]  The Oklahoma State Court of Criminal Appeals (the OCCA) also reviewed Workman's claim regarding the juror and found no error in the trial court's actions.  Workman v. State, 824 P.2d 378, 380-81 (Okla. Crim. App. 1991).  Under Oklahoma law, "no person shall be disqualified as a juror by reason of having formed or expressed an opinion upon the matter or cause to be submitted to such jury, founded upon . . . statements in public journals . . . provided it appears to the court, upon his declaration . . . that he can and will . . . act impartially and fairly upon the matters to be submitted to him."  Okla. Stat. tit. 22, §662.

Prior to being sworn in, one of the jurors told the judge that she had seen a report about Workman's case on the television that morning and would have a difficult time believing that the child he was accused of murdering could have been fatally injured by "fall[ing] from a bed onto a cocktail table" as reported. One of her own children had fallen off of a couch onto the floor and suffered no injuries at all. As a result of this personal experience, the juror was "afraid it would take much more to convince me that [Workman is] innocent." ROA II, Tr. at 278.

The prosecutor and defense counsel examined the juror about her viewing of the television report, driving home the point that the actual charges at trial might be more detailed and that Workman's defense had not yet been presented. The juror was then asked whether, if she was permitted to stay on the jury, she could disregard anything she heard outside the courtroom and base her verdict only on the evidence that she heard in court. Id. at 280. To this question, the juror replied: "Yes, I can do that." Id. She reaffirmed her answer when asked again. Id. at 281 ("Yeah, I can do that.").

The judge heard further argument from counsel and then explained that the prospective juror "could probably be a fair and impartial juror. I think she's trying very hard to be absolutely fair . . . I'll overrule the motion to excuse her

for cause." Id. at 287. The defense attempted twice more to have her removed from the jury, but those motions were similarly denied.

The state court's decision to retain the juror does not appear contrary to established federal law. See generally 28 U.S.C. § 2254. Indeed, the Supreme Court has specifically upheld cases in which jurors have been allowed to serve after giving contradictory testimony on whether they could be fair. In Patton v. Yount, 467 U.S. 1025 (1984), for example, the Supreme Court wrote that it is generally a matter for the state courts to determine whether "a juror [who swears] that he could set aside any opinion he might hold and decide the cases on the evidence . . . [should be] believed." Id. at 1036.

Workman does not carry the heavy burden of showing that the state court's judgment constituted manifest error. We are bound by prescribed deference to the decisions of state courts under AEDPA and AFFIRM the denial of a writ on this basis.

## III. Jury instructions.

Workman makes the constitutional argument that the jury instructions in his case did not require the jury to make a finding as to his culpability for Amanda Holman's killing such that he should be eligible for the death penalty. In opposition, Oklahoma argues that Workman's constitutionality-of-the-jury-

instructions argument cannot be heard in federal court because it was not raised on direct appeal in state court and so is not exhausted.

The district court nevertheless found that Workman had raised his constitutional determination argument regarding the jury instructions on direct appeal in the state courts. We agree. Because the Eighth Amendment issue was raised on direct appeal but never addressed by the OCCA, Workman has exhausted his state remedies and we consider the issue de novo. See generally LaFevers, 182 F.3d at 711.

Workman's brief on direct appeal argued that it was impermissibly vague to subject a person to capital punishment on the basis of a prescription that may or may not require the jury to find intent to kill.[4] He specifically objected that it was a violation of the Eighth and Fourteenth Amendments to sentence him under such a scheme.

The Oklahoma Court of Criminal Appeals, though, never separately addressed Workman's argument regarding the constitutionality of the jury

---

[4] According to Workman's brief on direct appeal, "It is impermissibly vague to subject a person to capital punishment on the basis of an either/or prescription. Willfully is defined as that which is done on purpose, requiring absolutely no intent to violate the law or [to] injure another; while that which is done maliciously, requires the actor to possess a specific intent to harm, injure, or take the life of another." Although this section of the brief opened with a reference to vagueness doctrine, Workman concluded the section, as noted above, with reference to a violation of the Eighth and Fourteenth Amendments.

- 17 -

instructions. It did conclude that the Oklahoma state statute contained a mens rea requirement, but it did not address the constitutional adequacy of that requirement under the Eighth Amendment. See Workman, 824 P.2d at 383.

We find that Workman's formulation sufficiently raised the heart of an Enmund/Tison objection on direct appeal despite the failure of the Oklahoma state courts to recognize the issue. Workman's claim was therefore properly exhausted and federal courts may examine it under AEDPA.

Some background is necessary to understand the legal context of Workman's Enmund/Tison claim. To be convicted of first degree child abuse murder in Oklahoma, a jury must find that the defendant willfully or maliciously injured, tortured, maimed, or used unreasonable force on a child, and that the child died as a result. Okla. Stat. tit. 21, §707.7(c). The jury need not find that the defendant intended to kill the child. Cf. Malicoat v. State, 992 P.2d 383, 395 (Okla. Crim. App. 2000) (child abuse murder is a general intent crime). Child abuse murder in Oklahoma does not require the jury to find that the defendant intended to kill his victim, but rather the crime is a type of felony murder. See generally Black's Law Dictionary 556 (5th ed. 1979) (defining the traditional felony-murder rule as holding that "one whose conduct brought about an unintended death in the commission or attempted commission of a felony [is] guilty of murder."); accord 2 Wharton's Criminal Law §147 (Charles E. Torcia

- 18 -

ed., 15th ed.) ("[T]he author of an unintended homicide is guilty of murder if the killing takes place in the perpetration of a felony.") [hereinafter Wharton's Criminal Law]. In this sense, the felony murder rule in its classic form is very broad, encompassing both crimes in which there are co-defendants, and crimes involving just a single actor. See 2 Substantive Criminal Law §14.5(b) (Wayne R. LaFave ed.); Wharton's Criminal Law at §147. Oklahoma categorizes child abuse murder as murder in the first degree. Fairchild v. State, 998 P.2d 611, 618 (Okla. Crim. App. 1999).

The central concern of the Enmund/Tison line of Supreme Court cases is whether a conviction for felony murder contains an adequate determination of defendants' culpability such that imposition of the death penalty does not violate the Eighth Amendment's prohibition against cruel and unusual punishment. U.S. Const. amend. VIII ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.").

Three Supreme Court cases in particular provide the necessary guidance as to the specificity required for a culpability determination in order to sustain the death penalty against an Eighth Amendment challenge. Enmund v. Florida is the

first of these three cases.[5]  458 U.S. 782 (1982).  As the Court itself explained in

a later case discussing Enmund:

> Enmund explicitly dealt with two distinct subsets of all felony
> murders in assessing whether Enmund's sentence was disproportional
> under the Eighth Amendment. At one pole was Enmund himself: the
> minor actor in an armed robbery, not on the scene, who neither
> intended to kill nor was found to have had any culpable mental state.
> Only a small minority of States even authorized the death penalty in
> such circumstances and even within those jurisdictions the death
> penalty was almost never exacted for such a crime. The Court held
> that capital punishment was disproportional in these cases. Enmund
> also clearly dealt with the other polar case: the felony murderer who
> actually killed, attempted to kill, or intended to kill. The Court
> clearly held that the equally small minority of jurisdictions that
> limited the death penalty to these circumstances could continue to
> exact it in accordance with local law when the circumstances
> warranted."
>
> Tison, 481 U.S. at 149-50 (emphasis added).

Workman's crime falls into the category of cases under Enmund in which a

felony murderer has "actually killed" his victim.  See id. at 150.  The phrase

"actually killed, attempted to kill, or intended to kill" or variations thereof is

---

[5]  In Enmund, the Supreme Court reversed the death sentence of a
defendant convicted under Florida's felony-murder rule.  458 U.S. at 801.
Enmund was the driver of a getaway car, and his accomplices conducted an armed
robbery of a home while he waited on the street in the car.  Id. at 784.  During the
course of the robbery, his accomplices shot and killed the elderly couple who
lived in the home.  Id.  The Supreme Court concluded on the basis of these facts
that, because Enmund had not himself killed, attempted to kill, or intended to kill
the victims of the robbery, his "degree of participation in the murders was so
tangential that it could not be said to justify a sentence of death."  Tison, 481 U.S.
at 148 (describing Enmund's ruling) (emphasis redacted).

repeated at least nine times in Enmund, 458 U.S. at 797, 793 n.15, 795, 796, 797, 798, 799, 801, is repeated at least three times in Tison, 481 U.S. at 148, 150, 152 n.4, and is repeated at least twenty times in Cabana v. Bullock, 474 U.S. 376, 378, 383, 384, 385, 386, 387, 387 n.4, 388 n.5, 389, 390, 391, 391 n.6, 392, 392 n.7. In short, the iteration of this test has been carefully formulated by the Supreme Court and often reaffirmed.  Accord also Revilla v. Gibson, 283 F.3d 1203, 1210 (10th Cir. 2002) (quoting language in Enmund requiring that a defendant "himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed").  The significance of falling into Enmund's category of when a felony murderer has "actually killed" his victim is that the Eighth Amendment's culpability determination for imposition of the death penalty has then been satisfied.[6]  Cabana, 474 U.S. at 386 ("If a person sentenced to death in fact killed . . . the Eighth Amendment itself is not violated by his or her execution.").

Five years later, the Supreme Court decided the case of Tison v. Arizona to consider situations between the two poles discussed in Enmund, specifically "whether the Eighth Amendment prohibits the death penalty in the intermediate

_____

[6] The particular case we examine today involves the serious and highly culpable felony of child abuse murder and conduct by the defendant directly causing the death of the victim.  We need not, and do not, in this case explore the outer parameters of whether the requisite culpability for imposition of the death penalty can be established when the underlying felony involves substantially less culpable behavior or where the causal connection between the defendant's conduct and the victim's death might be more attenuated or remote.

case of the defendant [who did not kill, attempt to kill, or intend to kill under Enmund but] whose participation [in the felony] is major and whose mental state is one of reckless indifference to the value of human life."[7]  Tison, 481 U.S. at 152.  In the general literature, Tison has thus come to be distinguished from Enmund as promulgating the test for defining the culpability determination necessary for "non-triggerman," as opposed to those who have "actually killed" under Enmund.  See, e.g., James J. Holman, Note, Redefining a Culpable Mental State for Non-Triggermen Facing the Death Penalty Tison v. Arizona, 33 Vill. L. Rev. 367 (1988); Andrew H. Friedman, Note, Tison v. Arizona: The Death Penalty and the Non-Triggerman: The Scales of Justice are Broken, 75 Cornell L. Rev. 123 (1989); see also generally Lynn D. Wittenbrink, Note, Overstepping Precedent?  Tison v. Arizona Imposes the Death Penalty on Felony Murder Accomplices, 66 N.C. L. Rev. 817 (1988).  While refusing "precisely [to] delineate the particular types of conduct and states of mind warranting imposition

_____

   [7]  Tison specifically considered the constitutionality of a death sentence imposed on a defendant convicted of felony murder but who did not himself kill the victims of the crime.  481 U.S. at 139-41.  The defendant's degree of participation in the murders in Tison, though, had not been as tangential as in Enmund.  See id.  Tison involved a scheme in which a heavily armed group entered a prison and escaped with two inmates.  Id. at 139.  In the course of their flight from the prison, their car broke down in the Arizona desert.  Id.  They flagged down a passing car containing a mother and father, their two-year old son, and a fifteen-year old niece.  Id. at 140.  After taking control of the family's car, the two escaped inmates murdered the family.  Id. at 141.

of the death penalty" in its intermediate zone of cases, the <u>Tison</u> Court simply held "that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the <u>Enmund</u> culpability requirement." 481 U.S. at 158.

Finally, <u>Cabana v. Bullock</u>[8] was a procedural case in which the Court considered who could make the determination of culpability if a case fell outside of the established categories in <u>Enmund,</u> and later <u>Tison,</u> after a jury's verdict. 474 U.S. 376 (1986), <u>abrogated on other grounds by</u> <u>Pope v. Illinois</u>, 481 U.S. 497, 503 n.7 (1987). However, only when a federal court reviews a claim in which the jury <u>has not already determined</u> that a defendant is culpable under <u>Enmund</u> because he killed, attempted to kill, or intended to kill, must a court consider further inquiry under <u>Cabana</u>. <u>Id.</u> at 380-84 (quoting at length the jury instructions in the case and examining them first for a potential finding of culpability); <u>see also</u> <u>id.</u> at 387. In that rare situation in which a jury has not already made a finding that permits a defendant's case to fall into one of the defined categories under <u>Enmund</u> or <u>Tison,</u> <u>Cabana</u> held that state courts may make the finding on appeal, or, as a final alternative, that the finding may be

---

[8] The facts in <u>Cabana</u> were that Crawford Bullock held a man down as a friend smashed a bottle over the man's head and then pummeled him to death. <u>Cabana</u>, 474 U.S. at 379. Bullock also helped the friend dispose of the man's body afterwards. <u>Id.</u> He confessed to his participation in these events and was convicted by a Mississippi jury of felony capital murder. <u>Id.</u>

made by a federal court upon review for habeas corpus. Id. at 390 ("[Assuming that the Enmund determination is not made at trial], [t]he federal court could itself make the factual determination whether the defendant killed, attempted to kill, or intended to kill, and either grant or deny the writ depending on the outcome of that inquiry. Alternatively, the federal court could take steps to require the State's own judicial system to make the factual findings in the first instance. . . . We believe . . . that the second course of action is the sounder one . . . [and that the state court should have the initial] opportunity to carry out in the first instance the factual inquiry called for by Enmund."); id. at 386 ("At what precise point in its criminal process a State [or federal court on review for habeas corpus] chooses to make the Enmund [or Tison] determination is of little concern from the standpoint of the Constitution.").

This is not the first time that we have confronted a defendant's Enmund/Tison challenge to a death sentence imposed after conviction under Oklahoma's first degree child abuse murder statute. In Revilla v. Gibson, 283 F.3d 1203 (10th Cir. 2002), the defendant similarly argued in his federal habeas proceeding that the state courts did not make findings that established the level of culpability required by Enmund or Tison to impose a death sentence. Id. at 1210–11. In Revilla's case, we found that we could easily dispose of the petitioner's Enmund/Tison claim because the OCCA had, in that case, found that

the victim had died as a result of "injuries intentionally inflicted by the Appellant in a premeditated design to effect death." Id. at 1211. Nevertheless, we cautioned that we were not holding that an additional culpability determination was necessary where the defendant had actually killed the victim, and we stated explicitly that in Revilla we were "avoid[ing], rather than implicitly resolv[ing] this debate."[9] Id. at 1211, n.4; see also Cannon v. Gibson, 259 F.3d 1253, 1279 n.26 (10th Cir. 2001) (noting the OCCA and district court's doubts whether additional Enmund or Tison culpability determinations would be required in a case in which the defendant actually killed the victim, but finding that it did not have to address the question).

---

[9] Our discussion of the issue in Revilla was:

> Our decision to affirm on this [substantive rationale] does not imply that an Enmund claim would otherwise necessarily be established on these facts. Enmund, a felony murder case in which the defendant did not kill the victim, held that the Eight Amendment prohibits capital punishment 'for one who neither took life, attempted to take life, nor intended to take life.' Enmund, 458 U.S. at 787 [emphasis added by the Tenth Circuit] . . . . Since Revilla did in fact kill [his victim], it is not clear that Enmund would undermine use of the death penalty here, whatever his intent . . . . By rejecting Revilla's Enmund claim on [another basis], we merely avoid, rather than implicitly resolve, this debate.

> Revilla, 283 F.3d at 1211 n. 4.

- 25 -

In other cases, we have appeared to assume that the culpability requirement in Enmund or Tison was satisfied where the jury verdict determined that the defendant actually killed the victim. In Johnson v. Gibson, 169 F.3d 1239 (10th Cir. 1999), for example, we held that the requisite culpability was established when a defendant killed his victim during the felony of rape. First, we reiterated language found in Tison:

> [T]he reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

> Id. at 1250 (quoting Tison 481 U.S. at 157).

We then went on to conclude:

> The jury in [Johnson's case] was instructed that it should find the defendant guilty if it found beyond a reasonable doubt that he 'did . . . willfully and unlawfully kill [his victim], [b]y asphyxiation with his hands inflicting mortal wounds which caused her death . . . [w]hile in the commission of Forcible Rape in the First Degree.' Such an instruction is sufficient to satisfy the requirements of Tison, and the evidence presented at trial supports this conclusion.

Id. at 1250-51 (citations omitted).

We now hold that the constitutional check that Enmund, and certainly that Tison, represent is satisfied in felony murder cases in which the defendant actually killed his victim. Other Circuits have read the Supreme Court's decisions the same way. In Murray v. Delo, 34 F.3d 1376 (8th Cir. 1994), the Eighth

- 26 -

Circuit wrote that "<u>Enmund</u> and <u>Tison</u> are felony-murder cases which apply in situations in which the defendant was not the shooter. [Here] the evidence at trial indicated that the petitioner actually committed at least one murder, and perhaps both." <u>Id.</u> at 1367. In <u>Adams v. Wainwright</u>, 709 F.2d 1443 (11th Cir. 1983), the Eleventh Circuit wrote that "[t]he Supreme Court held the death penalty disproportionate to Enmund's culpability, reasoning that he personally 'did not kill or attempt to kill' or have 'any intention of participating in or facilitating a murder.' Here [the defendant] personally killed his victim, savagely beating him to death." <u>Id.</u> at 1447. Finally, in <u>Williams v. French</u>, 146 F.3d 203 (4th Cir. 1998), the Fourth Circuit wrote:

> The evidence in this case satisfied the <u>Enmund</u> [and therefore also the lower <u>Tison</u>] standard because [the defendant] was a major participant in the murder itself, and his actions showed a reckless indifference to [the victim] Joines' life. Williams got out of the car carrying his loaded shotgun, went inside the Service Distributors station, stood behind or over Joines, and shot Joines in the back of his head after the robbery had been accomplished. Manifestly, these circumstances satisfy the standard set forth in <u>Enmund</u> and its progeny.

<u>Id.</u> at 215.

Oklahoma has also given the same reading as we do to <u>Enmund</u> and <u>Tison</u>. In <u>Fairchild v. State</u>, 998 P.2d 611 (Okla. Crim. App. 1999), the OCCA stated "[t]his Court has found <u>Tison</u> does not apply to a defendant who, by his own hand, does kill . . . If a person sentenced to death in fact killed, attempted to kill,

- 27 -

or intended to kill, the Eighth Amendment itself is not violated by his or her execution." Id. at 630 (quotation marks and citations omitted). Additionally, the California Supreme Court has concluded that further analysis is not necessary under Enmund or Tison when the defendant in a felony murder does in fact kill, and that court has now overruled its earlier precedent to the contrary. People v. Anderson, 742 P.2d 1306, 1325 (1987).

Workman was not convicted of felony murder generally: he was convicted of child abuse murder in which a jury determined that he had actually killed Amanda Holman, and that he had done so in the willful or malicious commission of physical battery upon the child. The evidence of abuse at trial included expert testimony regarding the multiple blows to the head and abdomen that the two-year-old suffered before she died. Three doctors testified that the child's death was caused by blunt trauma; her injuries were consistent with being hit by a fist, a hard object such as a board, or by being picked up by her legs and slammed into a wall. Workman was found to have purposefully inflicted these blows. We hold that no further analysis is required by a court under Enmund or Tison because the Eighth Amendment is not offended in this case of felony murder after the jury's finding that Workman actually killed his victim.[10] Enmund, 458 U.S. at 801;

---

[10] Moreover, even if the determination of culpability required by Enmund had not been so directly answered by the verdict of Workman's jury, under the

(continued...)

- 28 -

accord Revilla v. Gibson, 283 F.3d 1203, 1211 (10th Cir. 2002) (noting that Edmund restricted the imposition of the death penalty only on defendants who "aid[] and abet[] a felony in the course of which a murder is committed by others but who do[] not [themselves] kill.") (emphasis added).

Accordingly, the Enmund/ Tison test for culpability was satisfied by the jury's finding in this case and thus, on this issue, we AFFIRM the district court's dismissal of Workman's petition for habeas corpus.

IV.    Abeyance.

In Ring v. Arizona, 536 U.S. 584 (2002), the Supreme Court held that a capital defendant is entitled to have a jury determine the presence or absence of aggravating factors in death penalty cases.  Id. at 609 ("[W]e overrule [a previous case] to the extent that it allows a sentencing judge, sitting without a jury, to find

---

[10](...continued)
intermediate test in Tison, Workman certainly would have been found to be a major participant in the felony of abusing Amanda Holman and to have acted with reckless disregard for her life in committing that abuse.  The district court in Workman's case went beyond the requirements of Enmund to examine the facts of Workman's case and make a Tison finding, but the district court properly did this under Cabana when precedent in this circuit was unclear and once the state courts repeatedly refused on non-substantive grounds to adjudicate the case.  See 474 U.S. at 390.

an aggravating circumstance necessary for imposition of the death penalty."). The aggravating factors in Workman's case, though, <u>were</u> decided by the jury.

Nevertheless, Workman would have us read <u>Ring</u> for a different proposition than its central holding. He would expand <u>Ring</u>'s narrow holding from barring a sentencing judge, sitting alone, from finding aggravating circumstances to establishing that only juries, not judges ever, could find culpability necessary for the imposition of the death penalty under <u>Enmund</u> or <u>Tison</u>.

However, we do not in this case need to address this argument because, as noted above, the jury did determine that Workman actually killed Amanda Holman and thus the <u>Enmund</u>/<u>Tison</u> test is satisfied. Furthermore, <u>Ring</u> may not be applied retroactively to cases on collateral review. <u>Cannon v. Mullin</u>, 297 F.3d 989, 994 (10th Cir. 2002).

Accordingly, the <u>Ring</u> case does not aid Workman's argument, and we DENY his motion for abeyance.

**V.   Alleged vagueness of Oklahoma's "especially heinous, atrocious or cruel" aggravating circumstance.**

We have repeatedly held that Oklahoma's current definition of "especially heinous, atrocious or cruel" aggravating circumstance is not unconstitutionally vague.

Workman acknowledges that the Tenth Circuit has routinely upheld the constitutionality of this aggravating circumstance, see, e.g., Romano v. Gibson, 239 F.3d 1156, 1176 (10th Cir. 2001); Thomas v. Gibson, 218 F.3d 1213, 1226 (10th Cir. 2000); Medlock v. Ward, 200 F.3d 1314, 1319 (10th Cir. 2000); Moore v. Gibson, 195 F.3d 1152, 1175-76 (10th Cir. 1999); Smallwood v. Gibson, 191 F.3d 1257, 1274 (10th Cir. 1999); Hooks v. Ward, 184 F.3d 1206, 1239-40 (10th Cir. 1999); Foster v. Ward, 182 F.3d 1177, 1194 (10th Cir. 1999); Duvall v. Reynolds, 139 F.3d 768, 793 (10th Cir. 1998). Nevertheless, Workman attempts to find room for his argument that the aggravating circumstance is unconstitutionally vague in snippets of language from our cases such as a line from Thomas expressing doubt about blanket application of Oklahoma's early formulation and Judge Lucero's concurrence in Medlock. See generally Thomas, 218 F.3d at 1229 n.17 ("There exists, at a minimum, a serious constitutional question as to whether an aggravator which makes eligible for the death penalty all murderers who strike more than one blow adequately narrows the class of murderers eligible for the death penalty."); Medlock, 200 F.3d at 1324 ("There must be conscious suffering of more than the brief duration necessarily accompanying virtually all murders. Were this not so, the narrowing construction [that Oklahoma has given the aggravating circumstance] would not have the

discretion-limiting effect required by [the Eighth Amendment].") (Lucero, J., concurring).

Oklahoma, however, has limited application of the aggravating circumstance to only those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse. Stouffer v. State, 742 P.2d 562, 563 (Okla. Crim. App. 1987). This limitation was included in the jury instructions in Workman's case. ROA Criminal Appeal, Original Record at 98, Instruction No. 3 – penalty phase ("The phrase 'especially heinous, atrocious, or cruel' is directed to those crimes where the death of the victim was preceded by torture of the victim or serious physical abuse."). We have specifically found Oklahoma's new formulation to be constitutional since this limiting language was enacted. Hatch v. State, 58 F.3d 1447, 1468 - 69 (10th Cir. 1995); see also Duvall, 139 F.3d at 793. Moreover, the details of Workman's crime of first-degree child abuse murder seem to sit at the heart of what the Oklahoma statute contemplates in which the death of a victim is preceded by torture or serious physical abuse. See generally Stouffer, 742 P.2d at 563.

Workman's objection, therefore, has no merit and we AFFIRM the district court's denial of a writ of habeas corpus.

## VI.   Cumulative error.

Workman's sentence cannot be unconstitutional due to cumulative error because we have not found that the district court committed error.  Cumulative error is present when the "cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error." Duckett v. Mullin, 306 F.3d 982, 992 (10th Cir. 2002) (quoting United States v. Rivera, 900 F.2d 1462, 1469 (10th Cir. 1990)). "A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Id.

In reviewing a case for cumulative error, we may only consider actual errors in determining whether the defendant's right to a fair trial was violated. Le v. Mullin, 311 F.3d 1002, 1023 (10th Cir. 2002) (citing Rivera, 900 F.2d at 1470-71 ("[A] cumulative error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors.")).  Our analysis in this case, however, has not disclosed any errors.

Accordingly, we do not reverse on the basis of cumulative error.

**VII. Requested remand for an evidentiary hearing.**

Finally, Workman's case will not be remanded for an evidentiary hearing because he does not suggest what evidence has yet to be discovered, or what evidentiary questions might yet remain for resolution. His only proposed grounds for factual inquiry are into "<u>Enmund</u>/<u>Tison</u> issues" or "any factual issue present in this appeal to which the Appellee takes issue." There is no factual inquiry left to be done in his case. The State also contested no issue of fact on appeal.

As Workman presents no ground upon which his case could be remanded for an evidentiary hearing, we DENY his motion for remand.

## CONCLUSION

For the reasons stated above, we AFFIRM the district court's denial of a writ of habeas corpus. Additionally, we DENY Workman's request that we hold this appeal in abeyance and that we remand for an evidentiary hearing.