FILED
United States Court of Appeals
Tenth Circuit

February 16, 2010

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

# UNITED STATES COURT OF APPEALS

## TENTH CIRCUIT

BILLY D. ALVERSON,

    Petitioner-Appellant,

v.

RANDALL G. WORKMAN, Warden,
Oklahoma State Penitentiary,

    Respondent-Appellee.

No. 09-5000

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA
(D.C. No. 4:00-CV-00528-TCK-SAJ)**

---

Robert W. Jackson, (Steven M. Presson with him on the briefs), Presson Law
Office, Norman, Oklahoma, for Petitioner-Appellant.

Jennifer B. Miller, Assistant Attorney General (W. A. Drew Edmondson, Attorney
General of Oklahoma, with her on the brief), Oklahoma City, Oklahoma, for
Respondent-Appellee.

---

Before **KELLY, BRISCOE,** and **TYMKOVICH**, Circuit Judges.

---

**BRISCOE**, Circuit Judge.

---

    Petitioner Billy Alverson, an Oklahoma state prisoner convicted of first

degree murder and robbery with a dangerous weapon and sentenced to death in

connection with the murder conviction, appeals the district court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm the judgment of the district court.

I.

A. *Factual background*

The relevant underlying facts of this case were outlined in detail by the Oklahoma Court of Criminal Appeals (OCCA) in addressing Alverson's direct appeal:

> Alverson's co-defendant, Michael Wilson, worked at the QuikTrip convenience store located at 215 N. Garnett Road in Tulsa, Oklahoma. Wilson, Alverson, and two of their friends, Richard Harjo and Darwin Brown, went to the QuikTrip during the early morning hours of February 26, 1995. They chatted with Richard Yost, the night clerk, until the most opportune time arose for them to accost him and force him into the back cooler. They handcuffed him and tied his legs with duct tape. Alverson and Harjo went outside and returned with Harjo carrying a baseball bat.
>
> Yost was found beaten to death in a pool of blood, beer and milk. Part of a broken set of handcuffs was found near his right hip. The medical examiner found a pin from these handcuffs embedded in Yost's skull during the autopsy. Two safes containing over $30,000.00 were stolen, as well as all the money from the cash register and the store's surveillance videotape. All four defendants were arrested later that same day wearing new tennis shoes and carrying wads of cash. The stolen drop safe and the store surveillance videotape, as well as other damaging evidence, was found in a search of Alverson's home. The baseball bat, the victim's bloody QuickTrip [sic] jacket, the other cuff from the set of broken handcuffs, and Wilson's Nike jacket which matched the one he wore on the surveillance tape were taken from Wilson's home.

Alverson v. State, 983 P.2d 498, 506 (Okla. Crim. App. 1999) (Alverson I)

2

(internal paragraph numbers omitted).

### B. *Alverson's trial and direct appeal*

Alverson, Wilson, Harjo and Brown were "charged conjointly . . . with the crimes of first degree malice murder and, in the alternative, first degree felony murder (Count I) in violation of 21 O.S.1991, § 701.7(A) & (B) and robbery with a dangerous weapon (Count II) in violation of 21 O.S.1991, § 801 in the District Court of Tulsa County, Case No. CF-95-1024." Id. at 505. The State filed a bill of particulars alleging three aggravating circumstances: (1) that the murder was especially heinous, atrocious or cruel; (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution; and (3) the existence of a probability that Alverson would commit criminal acts of violence that would constitute a continuing threat to society. "Alverson and co-defendant Harjo were tried conjointly, but with separate juries deciding their fate." Id. at 506. Alverson's jury found him guilty of first degree murder and robbery with a dangerous weapon. At the conclusion of "the punishment stage, [Alverson's] jury found the existence of two aggravating circumstances: (1) that the murder was especially heinous, atrocious or cruel; and (2) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or prosecution." Id. The jury rejected the continuing threat aggravator. Ultimately, Alverson's jury fixed his punishment at death for the first degree murder conviction and life imprisonment for the robbery conviction. The state trial court sentenced Alverson

3

in accordance with the jury's verdict.

On May 6, 1999, the OCCA affirmed Alverson's convictions and sentences on direct appeal. Id. at 522. Alverson filed a petition for rehearing, which was denied by the OCCA. Alverson then filed a petition for writ of certiorari with the United States Supreme Court, which was denied on January 10, 2000. Alverson v. Oklahoma, 528 U.S. 1089, 1089 (2000).

### C. Alverson's application for state post-conviction relief

On April 26, 1999, while his direct appeal was still pending before the OCCA, Alverson filed an application for post-conviction relief directly with the OCCA. In connection with that application, Alverson also filed an application for an evidentiary hearing. On July 19, 1999, the OCCA issued an unpublished order denying Alverson's applications. Alverson v. State, No. PC-98-182 (July 19, 1999) (Alverson II).

### D. Alverson's federal habeas proceedings

Alverson initiated this federal habeas action on June 27, 2000, by filing a pro se motion to proceed in forma pauperis and a motion for appointment of counsel. Alverson's motions were granted and, on January 9, 2001, Alverson's appointed counsel filed a preliminary petition for writ of habeas corpus asserting eighteen grounds for relief. ROA, Doc. 11. On January 31, 2001, Alverson's appointed counsel filed an amended petition asserting only eight grounds for relief, including a claim of entitlement to a federal evidentiary hearing. Id., Doc.

4

the preliminary petition" and to "delete[] claims and more specifically assert facts and authorities in support of the retained claims." Id. at 1 n.1. On December 5, 2008, the district court denied Alverson's amended petition. On that same date, the district court entered judgment in favor of respondent and against Alverson.

On December 25, 2008, Alverson filed with the district court an application seeking a certificate of appealability (COA) with respect to four issues: (1) whether the state trial court violated Alverson's rights under Ake v. Oklahoma, 470 U.S. 68 (1985), by denying his requests for funding for a neuropsychological examination; (2) whether Alverson's constitutional rights were violated due to the state's introduction of insufficient evidence to establish that he substantially participated in the murder; (3) whether Alverson's trial counsel was constitutionally ineffective for failing to conduct an adequate investigation concerning head traumas suffered by Alverson during his youth; and (4) cumulative error. The district court granted Alverson's application in its entirety. Alverson filed his notice of appeal on January 2, 2009.

## II.

Our review of Alverson's appeal is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved

by the state courts.  Id.

If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2).  "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly."  McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003).  "Rather, we must be convinced that the application was also objectively unreasonable."  Id.  "This standard does not require our abject deference, but nonetheless prohibits us from substituting our own judgment for that of the state court."  Snow, 474 F.3d at 696 (internal quotation marks and citation omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching.  That is, because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error.  McLuckie, 337 F.3d at 1197.

III.

6

*A. Denial of funding for neuropsychological examination*

Alverson contends that his due process rights, as outlined in the Supreme Court's decision in <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), were violated as a result of the state trial court denying his requests for funding to conduct a neuropsychological examination to investigate the possible effects of head injuries that he suffered as a child. Alverson also asserts two related arguments: (1) that he received incompetent mental health assistance from social worker Jean Carlton in the presentation of his second-stage defense; and (2) that he was prejudiced by the lack of qualified expert assistance.

As we shall discuss in greater detail below, the <u>Ake</u> claim was addressed by the OCCA *sua sponte* in resolving Alverson's direct appeal, and, as a result, the OCCA's resolution of that claim is subject to review under the deferential standards outlined in 2254(d). Further, we conclude the OCCA's resolution of the <u>Ake</u> claim was neither contrary to, nor an unreasonable application of, clearly established federal law. Finally, because the OCCA reasonably rejected Alverson's <u>Ake</u> claim, it is unnecessary to reach the merits of Alverson's two related arguments.

*1) Relevant procedural history from state trial court*

We begin by recounting, in some detail, the procedural history of Alverson's attempts to obtain funding for a neuropsychological examination. On October 29, 1996, Alverson's trial counsel filed with the state trial court a

pleading entitled "Application for Funds for Social Study and Psycological [sic] Evaluation for Defendant, Billy Don Alverson." State ROA at 188. The application alleged that Alverson's "family [wa]s unable or unwilling to pay the costs of a social study on . . . Alverson," and that a "social study [wa]s imperative and necessary insofar as . . . Alverson . . . [wa]s charged with a first degree murder capital case." Id. The state trial court summarily denied the application on the ground that Alverson had failed to establish he was indigent.

On March 20, 1997, Alverson filed an "Amended Application for Appointment of Expert Assistance and Funds for a Social Study and Psycological [sic] Evaluation for Defendant, Billy Don Alverson." Id. at 278. The amended application sought the "appointment of an expert to do a social study and other psychological evaluations of" Alverson for purposes of "the mitigation stage of the trial." Id. In support of this request, the application alleged that Alverson was indigent. Id. at 279. The application further alleged that trial counsel "ha[d] discussed with Jean Carlton, L.C.S.W. [licensed clinical social worker], a person trained to test and evaluate [Alverson] as to their opinion of such matters such as [Alverson's] psychological make-up, including testing to determine if [Alverson] [wa]s a psychopath, [or suffered from] impulsive disorder, inadequate personality disorders and/or any physical impairments that would be very material as evidence in mitigation and/or assistance to [Alverson] in defending the State's request for the death penalty." Id. The application ultimately requested "that . . .

8

Carlton . . . be appointed to conduct any and all necessary tests and testify as to the results of all testing on [Alverson's] behalf." Id.

That same day, March 20, 1997, the state trial court granted Alverson's amended application and authorized funding for Alverson to hire Carlton "to psychologically evaluate [him] for the purpose of presenting evidence on [his] behalf . . . at the time of trial." Id. at 287. According to the record, Carlton proceeded to test and evaluate Alverson and reported her findings to Alverson's trial counsel.

On May 1, 1997, Alverson filed a second amended "Application for Appointment of Expert Assistance and Funds for a Psycological [sic] Evaluation." Id. at 327. The pleading alleged that Carlton, "as a result of her testing during the social history background testing found signs of organic brain impairment and believe[d] it [wa]s necessary to confirm by way of additional expert evaluation." Id. at 328. In particular, the pleading alleged that "[t]he MMPI-2 test which [Alverson] took . . . recommended neuropsychological testing for organic brain impairment." Id. In turn, the application alleged that "[t]he results of neuropsychological testing would definitely prove any brain impairment and to what extent that would impinge and influence [Alverson's] behavior." Id. Such information, the application alleged, "[wa]s crucial and very important to be placed before the jury as part of [Alverson's] mitigation as help in determining punishment . . . ." Id. Ultimately, the application "requested that Lance Karfgin,

9

Ph.D., be appointed to conduct any and all necessary tests and testify as to the results of all testing on [Alverson's] behalf." Id.

On May 2, 1997, the state filed an objection to Alverson's second amended application. The state alleged that Carlton "ha[d] not demonstrated that she possesse[d] or ha[d] otherwise obtained appropriate training, education, specialized knowledge, or expertise in the fields of neuropsychology or neurology to qualify her to draw relevant inferences or to make recommendations as to [Alverson's] stated need for further evaluation in these areas involving questions of neurological functioning . . . ." Id. at 343. Further, the state alleged that "[t]he MMPI-2 ha[d] not been demonstrated to be a reliable and valid assessment or screening measure in the fields of neurology or neuropsychology for screening or otherwise providing a basis for inferring the evidence of neurological impairment," id., "[b]ased upon the statements given to . . . Carlton by [Alverson] and [his] family members . . . , there [wa]s no indication that [Alverson] ha[d] sustained neurological impairment to warrant neurological evaluation and, in fact, these statements [we]re contradictory," id., and "[b]ased upon the medical reports provided by [Alverson], there [wa]s no evidence from any of the written statements of attending physicians present following any accidents sustained by [Alverson] that a referral for neurological evaluation was indicated or otherwise deemed necessary," id. at 344. In short, the state alleged that "no evidence exist[ed] to support [Alverson's] . . . request for neurological testing," and that

10

Alverson had failed to establish that he "w[ould] in any way be prejudiced by the lack of expert assistance in this regard." Id.

On May 5, 1997, the first day of voir dire proceedings, the state trial court held a hearing on Alverson's second amended application and ultimately overruled it. In doing so, the state trial court stated:

> I have reviewed the records that Ms. Carlton turned over to [defense counsel] and that [defense counsel] in turn turned over to the District Attorney's Office, including her results from the MMPI-2, and the medical records that were turned over to Ms. Carlton, and, again, by [defense counsel] to the District Attorney's Office. And I don't know very much about the MMPI except what I read when people have taken the test, and it's someone coming before the court, but I don't think that from the giving of the MMPI that Ms. Carlton or anyone else, from what I understand about the test, could give us a determination as to whether Mr. Alverson has some neurological problems.
>
> I did not find in any of the results from the MMPI of the work that Ms. Carlton did, that Mr. Alverson has sustained any neurological impairment that warrants an evaluation.
>
> And in addition, just as [the prosecutor] said in his motion of objection, I didn't see any written statements from any of the physicians that have attended to Mr. Alverson following any of the accidents that you show that he sustained that showed that he had any type of neurological damage or that an evaluation was necessary. As [the prosecutor] said just a minute ago, he had some childhood accidents and has done some things as a child, maybe some things more dangerous than others, but he's had some things happen to him that seem to be pretty run-of-the-mill to me.

Tr. of Jury Trial, Vol. I of X (May 5, 1997), at 28-29.

On May 9, 1997, Alverson filed a pleading entitled "Amended Motion to Appoint Psychological Expert" asking the state trial court "to reconsider the

11

denial of the original motion." State ROA at 358. Attached to the pleading was a

letter from Dr. Karfgin to defense counsel that stated as follows:

> Thank you for considering using my services a[s] an expert witness in Mr. Alverson's upcoming sentencing trial. I understand that your motion that the court appoint me to provide this service was rejected. As a concerned citizen, I nevertheless would like to make you aware of what I believe may be mitigating circumstances in this case. Had I conducted a formal evaluation of Mr. Alverson, I would have addressed these issues in detail. My impressions at this time are based only on a preliminary review of the psychosocial evaluation of Mr. Alverson, conducted by Ms. Gene [sic] Carlton, LCSW.
>
> During her clinical interview Ms. Carlton found that the defendant several times seemed to lose contact with her for a minute or more. She believed these incidents were more than simply lapses in attention but found them difficult to classify. Since Mr. Alverson did recount having sustained several concussive injuries resulting in loss of consciousness, she concluded he might be experiencing some type of seizure disorder and recommended that he be evaluated for an organic mental syndrome. Although a temporal lobe seizure disorder could account for such transient disruptions, based on my discussion with Ms. Carlton I believe that Mr. Alverson might also be experiencing some form of post-traumatic disorder, with dissociative features manifesting in the dangerous and violent atmosphere of a correctional institution. Ms. Carlton found the defendant to have an extensive history of early physical abuse and parental alcoholism, and to be amnestic for a period of several years in middle childhood. The psychic numbing and avoidance associated with PTSD, as well as a tendency to disassociate in violent situations, could have diminished Mr. Alverson's capacity to prevent or extricate himself from the capital crime of which he was convicted. I believe it would be important to consider this possibility in his upcoming sentencing trial.

Id. at 360.

On May 13, 1997, prior to the introduction of the state's evidence, the state

12

trial court held an in-chambers hearing to address Alverson's amended application

seeking funding for Dr. Karfgin. The state trial court noted it had examined the

parties' submissions, including an exhibit submitted by the state containing

Oklahoma Department of Corrections' records regarding Alverson and his prior

periods of confinement. The state trial court also noted it had taken into

consideration "the times that it ha[d] spent in the court room with Mr. Alverson,

both before . . . the Jackson v. Denno hearing and also when [they] had the

Jackson v. Denno hearing." Tr. of Jury Trial, Vol. V of X (May 13, 1997), at 4.

The state trial court found

> that Mr. Alverson never demonstrated any of the symptoms that have
> been alleged while he was in the court's presence; not when he
> testified and at no time when he ha[d] been in the courtroom. None
> of these [prior] records indicate those symptoms, any of the
> symptoms. And none of the records indicate any past problems that
> Mr. Alverson had claimed to have had from himself or any of his
> family members, or anyone else, really, that's had contact with him,
> up until this time.

Id. In turn, the state trial court concluded, "based on the records and [its]

common sense and time that [it had] spent around Mr. Alverson," that the

application should be overruled. Id.

During the penalty phase of the trial, Alverson presented testimony from

twelve witnesses, including Carlton.[1] On direct examination, Carlton described,

---

[1] The remaining eleven witnesses fell into two general categories: witnesses
aimed at rebutting the state's second-stage evidence indicating that Alverson had
engaged in prior acts of violence; and family members of Alverson who described
(continued...)

13

in extensive detail, Alverson's upbringing and personal life, with a particular emphasis on Alverson's presence, at age three, at the death of his uncle from a brain tumor, Alverson's father's alcoholism, Alverson's "clumsiness" during his formative years, emotional, physical and psychological abuse inflicted on Alverson by his father, and Alverson's own efforts to be a good father to his four children. Carlton also offered opinions as to the psychological effects of Alverson's childhood experiences, including so-called dissociative episodes, during which Alverson would purportedly become mentally "absent" for a brief period of time, the possibility that Alverson suffered from post-traumatic stress disorder, the fact that Alverson dealt with anger by suppressing it or walking away from the source of the conflict, Alverson's poor sense of identity and low self-esteem, and Alverson's difficulty engaging in independent actions and in turn being a follower.

On cross-examination by the state, Carlton conceded that Alverson's family members, when interviewed after Alverson's prior convictions, portrayed their family life as good. Carlton further conceded that in one test she administered to Alverson, she gave him the highest score possible on a checklist concerning pathological lying. Carlton also conceded that she was not qualified to administer the MMPI. Finally, Carlton agreed that a person's past behavior may be the best

----

[1](...continued)
Alverson and, essentially, asked the jury to spare Alverson's life.

indicator of their future behavior.

On redirect, Carlton testified she had consulted with Dr. Karfgin regarding Alverson's MMPI test results. On recross-examination, Carlton conceded those test results indicated (a) Alverson was hostile, irritable, moody, angry, antisocial, impulsive and overreactive, (b) that his irresponsible actions were without regard to consequences and could include violence and other criminal activities, (c) he had a low tolerance for frustration and difficulty delaying gratification, (d) he was socially shallow and lacking empathy, (e) he acted out and had typically poor judgment, (f) he had a significant need for excitement and exhibited extremes in search of pleasure and emotional stimulation, and (g) he was free of any inhibiting anxiety, worry or guilt.

*2) OCCA's sua sponte analysis of the Ake claim on direct appeal*

In his direct appeal to the OCCA, Alverson did not challenge the state trial court's denial of his application for funding to hire a neuropsychologist or his motion to reconsider that denial. Nor did he mention or even cite to the Supreme Court's decision in Ake. Instead, Alverson argued only, in the context of a multi-faceted ineffective assistance claim, that his trial counsel "was aware that [Alverson] had received a head injury in his youth," and that, "[g]iven the fact that there [wa]s an established relationship between the existence of traumatic head injury and persons on death row, this [wa]s a factor in mitigation that should have been explored." Alverson's Direct Appeal Br. at 31.

15

When ruling on Alverson's direct appeal, the OCCA rejected on the merits Alverson's claim that his trial counsel was ineffective for failing to investigate the purported head injuries:

> Finally, Alverson takes issue with counsel's failure to investigate alleged head injuries Alverson had received as a child. Counsel did request funds to hire an expert to look into this issue, which was properly denied by the trial court. Because Alverson has presented no evidence to support his contention that ordinary injuries he received as a child resulted in inorganic [sic] brain damage, we dispose of this claim on a lack of prejudice as well.

Alverson I, 983 P.2d at 511 (footnotes omitted). In a footnote to this paragraph, the OCCA also addressed, *sua sponte*, the question of whether the state trial court violated Ake by denying Alverson's applications for funding:

> The defense relied on the results of the MMPI-2 which the previously appointed expert, Jean Carlton, had administered. (O.R.II at 328) Carlon [sic] admitted during her testimony that she was not even qualified to administer the MMPI. (Tr.IX at 218-19) Even if she had been qualified, the trial court correctly ruled that the MMPI does not indicate whether a person has neurological problems, and additionally, none of the doctors who examined Alverson following his run-of-the-mill childhood accidents indicated the possibility that they had created neurological damage or that an evaluation for neurological damage was necessary. (Tr.I at 225-29) Accordingly, the trial court did not abuse its discretion in denying Alverson's motion for expert assistance at State expense. Rogers v. State, 1995 OK CR 8, ¶ 4, 890 P.2d 959, 967 (before a defendant may qualify for court-appointed expert assistance, he must make a showing of need and show that he will be prejudiced by the lack of expert assistance), citing Ake v. Oklahoma, 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985).

Id. at 511 n.34. In a second footnote to the same paragraph, the OCCA further noted:

> In any event, some evidence regarding head injuries was presented in

16

second stage for the jury to consider. The testifying witness acknowledged the injuries were relatively minor-only one football injury required medical care which Alverson received, with no notation that permanent or even serious damage had resulted. (Tr.IX at 158-59, 167, 180-81)

Id. at 511 n.35.

*3) Alverson's assertion of Ake-related claims on post-conviction*

In his application for state post-conviction relief, Alverson argued to the OCCA, for the first time, that the state trial court's denial of his applications for funding deprived him of the tools necessary for an adequate defense in violation of Ake. Alverson also asserted three related arguments. The OCCA, in denying Alverson's application, concluded that Alverson's arguments were procedurally barred due to Alverson's failure to raise them on direct appeal:

In Proposition I [of his application for post-conviction relief] Alverson claims the trial court's denial of his requests for funds to hire a neuropsychologist deprived him of the tools necessary for his defense in violation of Ake v. Oklahoma. Alverson raises four sub-propositions under the rubric of Proposition I: (a) the requisite showing was made at trial to trigger the trial court's duty to provide expert assistance; (b) Alverson received incompetent mental health assistance in preparation of his defense; (c) the trial court's failure to hold the Ake hearings ex parte violated his Fifth, Sixth and Fourteenth Amendment rights; and (d) Alverson was prejudiced by the lack of qualified expert assistance. Alverson presents two affidavits in support of this proposition. One is from Jean Carlton, the licensed clinical social worker who testified on Alverson's behalf at trial, reiterating her suspicions of possible organic brain damage. The second is from Dr. Phillip J. Murphy finding that Alverson suffers from an organic brain disorder of obscure etiology which was not known at the time of his trial.

All four arguments raised in the sub-propositions above could

17

have been raised on direct appeal but were not. Accordingly, they are waived [pursuant to Okla. Stat. tit. 22, § 1089(C)(1)]. In sum, nothing in Proposition I meets the threshold requirements of our post-conviction statutes that a claim (1) was not and could not have been raised on direct appeal; and (2) supports a conclusion that the outcome of the trial would have been different or that Alverson is factually innocent.

Alverson II at 2-3. The OCCA also stated, in a footnote to the above-quoted text, that "[i]n any event, we have already determined that the trial court's denial of a neurological Ake expert was proper, albeit in the context of Alverson's ineffective assistance of trial counsel claim on direct appeal." Id. at 3 n.7. Lastly, the OCCA denied Alverson's request for an evidentiary hearing in connection with his Ake-based arguments. Id. at 3 n.8.

*4) Federal procedural bar*

Alverson contends that the OCCA's *sua sponte* discussion on direct appeal of the state trial court's denial of his requests for additional funding for a neuropsychological evaluation permits us to reach the merits of his Ake claims. Respondent, in contrast, argues that, notwithstanding the fact that the OCCA on direct appeal *sua sponte* recognized and addressed the denial of funding issue, Alverson's own failure to present and argue his Ake claims on direct appeal bars federal habeas review of those claims. More specifically, respondent argues that we must give preclusive effect to the OCCA's conclusion in the state post-conviction proceedings that Alverson's Ake claims were not the proper subject of state post-conviction review. The district court, citing our decision in Hawkins v.

18

Mullin, 291 F.3d 658, 663 (10th Cir. 2002) (stating that where a state court actually decides an issue on the merits, state procedural bar will not preclude federal habeas corpus review), sided with Alverson on this procedural question and reached the merits of his Ake claims. Exercising de novo review, Williams v. Jones, 571 F.3d 1086, 1089 (10th Cir. 2009) ("Our review of the district court's legal analysis is de novo."), we agree with Alverson and the district court that Alverson's Ake claims may be reviewed on the merits in this federal habeas proceeding.

Supreme Court precedent directs us, in deciding how to resolve a federal claim raised by a state habeas petitioner, to focus on the last state court decision disposing of that federal claim. Coleman v. Thompson, 501 U.S. 722, 735 (1991); Ylst v. Nunnemaker, 501 U.S. 797, 801 (1991). Here, it is irrefutable that the OCCA's decision denying Alverson's application for state post-conviction relief was the last state court decision that disposed of Alverson's Ake claims. Thus, it is that decision that we turn to in determining whether Alverson's Ake claims may be reviewed on the merits, or are instead procedurally barred, in these federal habeas proceedings.

In its decision denying Alverson's application for post-conviction relief, the OCCA concluded that Alverson's Ake claims "could have been raised on direct appeal but were not," and were thus "waived" for purposes of post-conviction review. Alverson II at 3. In so concluding, the OCCA was obviously

19

relying on Oklahoma's capital post-conviction statute, which narrowly limits "[t]he . . . issues that may be raised [by a capital defendant] in an application for post-conviction relief [to] those that . . . [w]ere not and could not have been raised in a direct appeal . . . ."[2]  Okla. Stat. tit. 22, § 1089(C)(1).  In sum, the OCCA held that Alverson's Ake claims were not the proper subject of state post-conviction review.

The OCCA also acknowledged, in a footnote, that it "ha[d] already determined that the trial court's denial of a neurological Ake expert was proper, albeit in the context of Alverson's ineffective assistance of trial counsel claim on direct appeal."  Alverson II at 3 n.7.  As we see it, this statement was not intended as an alternative holding because it did not expressly or implicitly presume, for purposes of argument, that Alverson's Ake claims were the proper subject of post-conviction review and did not purport to constitute a contemporaneous ruling on the Ake claims.  Cf. Sochor v. Florida, 504 U.S. 527, 534 (1992) (describing state appellate decision that included alternative bases, one procedural and one on the merits, for rejecting petitioner's federal constitutional claim).  Nor was the statement intended as a repudiation of the OCCA's prior *sua sponte* decision

_____

[2] Even if an issue asserted in an application for state post-conviction relief satisfies this narrow threshold requirement, it must also "[s]upport a conclusion either that the outcome of the trial would have been different but for the error[] or that the defendant is factually innocent."  Okla. Stat. tit. 22 § 1089(C)(2). Together, these two statutory requirements sharply limit the scope of issues that the OCCA may consider on post-conviction review.

(e.g., on the grounds that the <u>Ake</u> claim was not the proper subject of review on direct appeal due to Alverson's failure to argue it). Instead, the statement accurately recounted that the state trial court's denial of funding for a neuropsychological examination had already been affirmed, on the merits, on direct appeal. As a result, we conclude that the OCCA effectively reaffirmed its prior *sua sponte* decision[3], and that it is proper for us, on federal habeas review, to examine the merits of that determination.

We emphasize that this is by no means the first time we have reached the merits of a § 2254 claim that was first considered on the merits by a state

_____

[3] According to our research, three other circuits have concluded that a state appellate court's *sua sponte* consideration of an issue not only satisfies § 2254's exhaustion requirement, but, more importantly for our purposes, also constitutes an adjudication on the merits that is ripe for federal habeas review. See <u>Comer v. Schriro</u>, 463 F.3d 934, 956 (9th Cir. 2006) (concluding, for purposes of federal habeas review, that a claim is exhausted and ripe for review on the merits if, under "Arizona's fundamental error review . . . the state appellate court . . . mentions it is considering the claim *sua sponte*"), <u>withdrawn on other grounds</u>, <u>Comer v. Stewart</u>, 471 F.3d 1359 (9th Cir. 2006) (granting rehearing en banc to consider whether to grant state habeas petitioner's motion to voluntarily dismiss the federal habeas proceedings); <u>Moormann v. Schriro</u>, 426 F.3d 1044, 1057 (9th Cir. 2005); <u>Walton v. Caspari</u>, 916 F.2d 1352, 1356-57 (8th Cir. 1990) (holding that a state appellate court's decision to raise and answer a constitutional question *sua sponte* permits subsequent federal habeas review); <u>Cooper v. Wainwright</u>, 807 F.2d 881, 887 (11th Cir. 1986) ("[A] state court's decision to raise and answer a constitutional question *sua sponte* will also permit subsequent federal habeas review"). Although two of these decisions predate AEDPA, we nevertheless conclude they have persuasive value because the exhaustion principles were essentially the same under pre-AEDPA law. Ultimately, we agree with the stance taken by these three circuits, and in turn conclude that the <u>Ake</u> claim at issue in this case is, as a result of the OCCA's *sua sponte* consideration of it on direct appeal, exhausted and ripe for review on the merits under the standards of review outlined in § 2254(d).

21

appellate court and then later rejected by that same court in a post-conviction proceeding as procedurally barred.  E.g., Mathis v. Bruce, 148 Fed. App'x 732, 735 (10th Cir. 2005) (considering issue first rejected on the merits by Kansas Court of Appeals on direct appeal, and then subsequently rejected by the Kansas Court of Appeals as the improper subject of state post-conviction proceeding); Johnson v. Champion, 288 F.3d 1215, 1226 (10th Cir. 2002) (considering issue first rejected on the merits by OCCA in initial post-conviction proceedings, and then subsequently rejected on procedural grounds by the OCCA in second post-conviction proceeding); Sallahdin v. Gibson, 275 F.3d 1211, 1227 (10th Cir. 2002) (considering issue that was implicitly rejected on direct appeal by OCCA, and then rejected as procedurally barred by OCCA in state post-conviction proceeding); cf. Revilla v. Gibson, 283 F.3d 1203, 1214 (10th Cir. 2002) (electing "to avoid complex procedural-bar issues" by resolving issue on the merits); Romero v. Furlong, 215 F.3d 1107, 1111 (10th Cir. 2000) (same).  Although the concurrence suggests that each of these cases "presented unique procedural or other questions that do not pertain here," Concurrence at 9, noticeably absent from its discussion is a citation to a single case from this circuit or any other that directly supports its position, i.e., that we must treat as procedurally barred a constitutional claim that was first considered and rejected on the merits by a state's highest appellate court, but that was later rejected by that same state appellate court as the improper subject of state post-conviction review.

22

*5) The merits of the Ake claim*

To obtain federal habeas relief on his Ake claim, Alverson must establish that the OCCA's *sua sponte* resolution of the claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). And, the Supreme Court's decision in Ake obviously provides the "clearly established Federal law" that we must consider in assessing Alverson's entitlement to federal habeas relief.

In Ake, the Supreme Court held that "when a State brings its judicial power to bear on an indigent defendant in a criminal proceeding, it must take steps to assure that the defendant has a fair opportunity to present his defense." 470 U.S. at 76. Without going so far as holding "that a State must purchase for the indigent defendant all the assistance that his wealthier counterpart might buy," the Court explained that indigent defendants must have "access to the raw materials," or "basic tools," "integral to the building of an effective defense." Id. at 77. Armed with this basic principle, the Court then turned its focus to the question of "whether, and under what conditions, the participation of a psychiatrist is important enough to preparation of a defense to require the State to provide an indigent defendant with access to competent psychiatric assistance in preparing the defense." Id. The Court concluded that "when a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor

23

at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." Id. at 83. Finally, and most relevantly to the present case, the Court held that a "similar conclusion" must be reached "in the context of a capital sentencing proceeding, when the State presents psychiatric evidence of the defendant's future dangerousness." Id. "In such a circumstance," the Court explained, "where the consequence of error is so great, the relevance of responsive psychiatric testimony so evident, and the burden on the State so slim, due process requires access to a psychiatric examination on relevant issues, to the testimony of the psychiatrist, and to assistance in preparation at the sentencing phase." Id. at 84.

Turning to the facts of Alverson's case, it is true that the state alleged his future dangerousness as an aggravating factor that warranted imposition of the death penalty. That allegation of future dangerousness was not, however, based on state-sponsored psychiatric evidence, but rather on Alverson's history of violent criminal conduct, including his role in the murder. Thus, under Ake, the state trial court was not automatically required to afford Alverson with the assistance of a mental health expert to counter any psychiatric evidence presented by the state. Instead, Alverson was required to demonstrate to the state trial court that his mental health could be a significant factor at trial. Alverson was able to satisfy this burden because the state trial court granted his request to appoint

24

Carlton to conduct a social study and psychological evaluation. Only when Alverson subsequently sought funding for an additional neuropsychological evaluation by Dr. Karfgin did the state trial court deny his requests.

In affirming the state trial court's denial of Alverson's requests for additional funding, the OCCA concluded that Alverson had failed to make a sufficient showing of need for the requested neuropsychological evaluation. In particular, the OCCA rejected Alverson's MMPI test results as a basis for neuropsychological testing, noting that Carlton admitted she was unqualified to administer the MMPI and that, in any event, the MMPI did "not indicate whether a person has neurological problems . . . ." Alverson I, 983 P.2d at 511 n.34. The OCCA also cited Alverson's medical records, noting that none of the doctors who examined him following "his run-of-the-mill childhood accidents indicated the possibility that they had created neurological damage . . . ." Id.

In this appeal, Alverson argues, and the dissent agrees, that the state trial court erroneously "required [him] to prove the very condition," i.e., organic brain damage, "he needed expert assistance to demonstrate." Aplt. Br. at 23. But Alverson's focus, as well as that of the dissent, is misplaced. In assessing whether a state prisoner has established his right to federal habeas relief under § 2254(d), our review is limited to examining whether the highest state court's resolution of a particular claim is contrary to, or an unreasonable application of,

25

clearly established federal law.[4]  See Johnson v. McKune, 288 F.3d 1187, 1200-01

(10th Cir. 2002) ("[W]e examine the decision of the highest state court to address

each relevant petition").  In other words, our focus is on the OCCA's rationale for

affirming the state trial court's denial of Alverson's requests for additional

funding.[5]  And, on that point, Alverson and the dissent are silent.  In particular,

neither Alverson nor the dissent dispute the OCCA's conclusion that the MMPI

results were invalid due to Carlton's lack of qualifications to administer the test,

or the OCCA's conclusion that the MMPI results, even if valid, could not indicate

the existence of neurological problems.  Nor do Alverson or the dissent challenge,

as clearly erroneous, the OCCA's finding that Alverson's childhood medical

---

[4] The dissent fails to acknowledge, let alone apply, the deferential standards of § 2254(d).

[5] Even if we, like Alverson and the dissent, were to focus on the state trial court's rulings, we are not persuaded they were contrary to Ake.  To begin with, we reject the dissent's suggestion that the state trial court attempted to "diagnose neurological disorders from the bench" or "denied funds [simply] because he personally did not note any signs of mental deficiency while Mr. Alverson was in court."  Dissent at 2.  As we have outlined, the state court records firmly establish that the state trial court considered a variety of information, including the results of Carlton's testing, Alverson's medical records, and Alverson's correctional records, in concluding that Alverson had failed, under Ake, to establish his entitlement to additional funding for a neuropsychological examination.

The most compelling evidence presented by Alverson in support of his requests for funding was Dr. Karfgin's letter.  The statements contained in that letter, however, were based not upon Dr. Karfgin's own evaluation of Alverson, but rather upon Carlton's observations and evaluation of Alverson.  The state trial court, based upon its review of all the information before it, found Carlton's observations less than credible, and Alverson has not attempted to challenge that factual determination under § 2254(d)(2).  Thus, Dr. Karfgin's statements must also be discounted.

26

records were void of any evidence to support a finding that Alverson may have suffered neurological damage.  See 28 U.S.C. § 2254(d)(2).

Although not framed as challenges to the OCCA's ruling, Alverson asserts two additional, but ultimately futile, arguments.  First, Alverson suggests that, regardless of the sufficiency of the evidence he presented to the state trial court in support of his requests for funding, the state's mere allegation of his future dangerousness, standing alone, was sufficient to require the state trial court to grant his requests.  The problem with this argument is that it is grounded not on Ake, but instead on our decision in Liles v. Saffle, 945 F.2d 333 (10th Cir. 1991). In Liles, a pre-AEDPA habeas case applying a de novo standard of review, we extended Ake to a situation where the state had presented non-psychiatric evidence of the indigent capital defendant's future dangerousness, and the defendant established the likelihood that his mental condition could have been a significant mitigating factor.[6]  Id. at 341.  Importantly, however, the Supreme Court has never considered, let alone approved of, Liles' extension of Ake.  Thus, Liles does not qualify as "clearly established federal law" under AEDPA, since it

_____

[6] In December 1998, approximately six months before Alverson's direct appeal was decided, the OCCA followed suit and adopted the Liles standard for use in Oklahoma capital trials.  Fitzgerald v. State, 972 P.2d 1157, 1169  (Okla. Crim. App. 1998) ("In the absence of any explicit limitation by the Supreme Court and given our extension of Ake to any expert assistance necessary for an adequate defense, logic and fairness dictate that a qualified defendant should receive expert assistance to rebut any State evidence of continuing threat.").

was not "determined by the Supreme Court of the United States . . . ."[7]  28 U.S.C. § 2254(d)(1).  See Hawkins v. Mullin, 291 F.3d 658, 671 n.6 (10th Cir. 2002) (questioning whether Liles' progeny could qualify as "clearly established" federal law for purposes of § 2254(d)(1)).

Second, Alverson contends he was "entitled to a psychiatric expert because the prosecution alleged that the murder was heinous, atrocious or cruel," and the OCCA "has held that this aggravating circumstance can be established by the defendant's state of mind."  Aplt. Br. at 25 (citing Browning v. State, 134 P.3d 816, 842 (Okla. Crim. App. 2006)).  There is no indication, however, that Alverson ever presented this argument to the OCCA.  Thus, the claim is unexhausted and, in turn, undoubtedly procedurally barred under Oklahoma state law.  Even if the claim could be considered on the merits, it is meritless.  In particular, the Supreme Court has never held that the appointment of a mental health expert is necessary to rebut an allegation that the murder at issue was heinous, atrocious or cruel.  Moreover, a review of the trial transcript in this case firmly establishes that the heinous, atrocious or cruel aggravator was based not upon Alverson's state of mind, but rather the brutal manner in which the victim

---

[7] Even if Liles could operate as "clearly established federal law" for purposes of § 2254(d)(1), we are not persuaded that it would be of any benefit to Alverson.  More specifically, the state trial court effectively satisfied Liles' requirement by granting Alverson's request for funding for Carlton.  Thus, in seeking additional funding for a neuropsychological examination, Alverson was left to satisfy the normal evidentiary burden outlined in Ake.

was killed.

*6) Alverson's <u>Ake</u>-related claims*

In addition to his <u>Ake</u> claim, Alverson asserts two related claims in this federal habeas appeal: (1) that he received incompetent mental health assistance from Carlton; and (2) that he was prejudiced by the lack of qualified expert assistance (i.e., the lack of a psychologist to conduct a neuropsychological evaluation and then testify about the results of that evaluation). Because, however, Alverson's <u>Ake</u> claim lacks merit, we find it unnecessary to reach these two related claims, since both would be relevant only if the state trial court were found to have violated <u>Ake</u> by denying Alverson's requests for additional funding.

*B. Sufficiency of evidence - HAC aggravator*

Alverson next mounts what he frames as a challenge to the heinous, atrocious or cruel aggravator found by the jury in his case, but his contention ultimately appears to be a challenge to the constitutionality of his death sentence. Alverson begins by asserting that the Eighth Amendment requires capital punishment to be based on "'individualized consideration'" of a defendant's culpability. Aplt. Br. at 44 (quoting <u>Lockett v. Ohio</u>, 438 U.S. 586, 605 (1978)). In turn, Alverson asserts that his death sentence was based in substantial part on the jury's second-stage finding that the murder was especially heinous, atrocious or cruel. Alverson argues, however, that the prosecution presented no evidence

29

that he personally "participate[d] in beating the victim," or that he even "introduced [the bat] into the cooler area . . . ." Aplt. Br. at 46. "Accordingly," he argues, "insufficient evidence was presented to support the heinous, atrocious or cruel aggravating circumstance" in his case. Id. at 47. In other words, Alverson argues, "[t]he Eighth Amendment does not permit the finding of the manner-specific heinous[,] atrocious or cruel aggravating circumstance for a defendant who does not personally kill, absent evidence establishing that the defendant intended a specific manner of killing." Id. at 45.

*a) Clearly established federal law*

Two lines of Supreme Court precedent supply the "clearly established federal law" applicable to this claim. First, in Jackson v. Virginia, 443 U.S. 307 (1979), the Supreme Court held that, in evaluating the constitutional sufficiency of evidence supporting a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Id. at 319 (emphasis in original). Second, in Enmund v. Florida, 458 U.S. 782 (1982), and Tison v. Arizona, 481 U.S. 137 (1987), the Supreme Court explored the question of "whether a conviction for felony murder contains an adequate determination of [a] defendant['s] culpability such that imposition of the death penalty does not violate the Eighth Amendment's prohibition against cruel and unusual punishment." Workman v. Mullin, 342 F.3d

30

1100, 1110 (10th Cir. 2003). In Enmund, the Supreme Court held that the death penalty was a disproportional punishment for a defendant who was a "minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." Tison, 481 U.S. at 149 (describing Enmund). In reaching this conclusion, the Court in Enmund "also clearly dealt with the [opposite] case: the felony murderer who actually killed, attempted to kill, or intended to kill." Id. at 150. With respect to this category of felony murder, the Court held that the death penalty was a valid penalty under the Eighth Amendment. Id. "The significance of falling into Enmund's category of when a felony murderer has 'actually killed' his victim is that the Eighth Amendment's culpability determination for imposition of the death penalty has then been satisfied." Workman, 342 F.3d at 1111. In Tison, the Court addressed "whether the Eighth Amendment prohibits the death penalty in the intermediate case of the defendant [who did not kill under Enmund but] whose participation [in the felony] is major and whose mental state is one of reckless indifference to the value of human life." 481 U.S. at 152. Without "precisely delineat[ing] the particular types of conduct and states of mind warranting imposition of the death penalty" in this intermediate zone of cases, the Court held "that major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Id. at 158.

b) OCCA's resolution of the issue

31

Alverson presented a similar version of this argument on direct appeal. In particular, Alverson argued that, "to make [him] eligible for the death penalty, the State [was required to] prove at least that [he] substantially participated in the killing to the degree that he exhibited reckless indifference to the loss of human life." State Aplt. Br. at 50-51 (citing Tison v. Arizona, 481 U.S. 137 (1985)). Alverson further argued that, "[e]ven using [his] illegally obtained confession as its main source of evidence of his involvement, the State failed to prove the elements of Tison v. Arizona to justify imposition of the death penalty on [him]." Id. at 51.

The OCCA rejected Alverson's arguments:

Alverson argues in the alternative that even if the evidence is sufficient to support the heinous, atrocious and cruel aggravator, it is legally insufficient to show he inflicted the serious physical abuse or intended that it take place. We disagree. The evidence showed Alverson was a substantial participant in the murder. He actively participated in the initial attack wherein the victim was dragged into the cooler. Alverson came out of the cooler to straighten up store merchandise that he and his cohorts had knocked off the shelves during the attack, then re-entered the cooler. Alverson actively participated in bringing the baseball bat, and arguably the handcuffs, into the cooler. Although Harjo carried the bat, Alverson led the way outside the store to retrieve it and back inside to the cooler. By introducing a dangerous weapon into the robbery, Alverson "created a desperate situation inherently dangerous to human life." Moreover, Alverson was inside the cooler when some of the beating was administered. Accordingly, we find the evidence clearly showed that even if Alverson did not deliver the blows himself, he knew the murder was to take place and actively participated in it.

Alverson I, 983 P.2d at 516 (emphasis in original; internal paragraph number and

32

footnotes omitted).[8]

*c) § 2254(d) analysis*

Alverson contends the OCCA's "discussion is flawed" in a number of respects. Aplt. Br. at 47. To begin with, he contends "there [wa]s no proof that [he] obtained the bat that was used to beat Mr. Yost." Id. at 46. Second, he contends that the OCCA's determination that he "'knew' a murder was about to take place" "is contradicted by" the fact that "Yost was restrained in the cooler with handcuffs and two of the co-defendants . . . watching him." Id. at 48. Third, Alverson contends "[t]here was no evidence other than mere speculation that [he] knew what Mr. Harjo was about to do," and "[a]lthough a baseball bat can become a lethal weapon, it is not a gun or a knife." Id. Finally, Alverson contends "[t]here was insufficient evidence to show that [he] carried handcuffs into the walk-in cooler," thus explaining why the OCCA said he "'arguably' did so." Id.

Alverson's contentions are directly refuted by, and in turn the OCCA's decision[9] is directly supported by, State's Exhibit Number 1, which is a copy of

---

[8] Alverson also challenged the "heinous, atrocious or cruel" aggravator on direct appeal by arguing that "the State presented insufficient evidence to show the victim was conscious for a significant length of time before losing consciousness so as to render his death 'one preceded by torture or serious physical abuse' . . . ." Alverson I, 983 P.2d at 515. Alverson does not raise this issue in his federal habeas appeal.

[9] Respondent suggests that the OCCA made "factual findings" that must be
(continued...)

the surveillance tape that depicts the events that occurred in the QuikTrip on the day of the murder. Although the actual murder is not depicted on the tape, since the cooler area of the store cannot be observed, the tape does show the four codefendants surrounding Yost, attacking him, and dragging him, against his will, into the cooler area. The tape also shows Alverson subsequently leaving the cooler, followed shortly thereafter by Harjo, walking outside to the defendants' car, obtaining the bat which he handed to Harjo, and then returning to the cooler area with the bat (carried by Harjo) and another item, possibly handcuffs, in tow. Further, the tape indicates that Alverson was present in the cooler at the time when Yost was beaten with the bat, since the "pings" of the bats, as well as Yost's moans, can be heard on the audio portion of the tape. Finally, the tape establishes that after codefendants Wilson and Harjo left the cooler, Alverson and Brown remained behind, and one of those two codefendants continued to inflict blows on Yost with the bat (since, again, "pings" can continue to be heard on the audio portion of the tape). In sum, the jury could clearly have inferred, based upon its viewing of (and listening to) the surveillance tape, that Alverson was well aware that a murder was going to occur and may well have directly participated in beating Yost with the bat.

---

[9](...continued)
presumed correct under 28 U.S.C. § 2254(e)(1) unless rebutted by clear and convincing evidence. Aplee. Br. at 41 n.7. This is incorrect. The OCCA was instead making a legal determination of whether the evidence presented by the State was sufficient to establish that Alverson participated in the murder.

Moreover, Alverson's Enmund/Tison arguments are effectively foreclosed by the jury's first-stage verdicts of guilt of both first degree felony murder and first degree malice aforethought murder. State Court ROA at 432-33. In order to reach this latter verdict, the jury had to find that Alverson caused the victim's death and, in doing so, had "[t]he deliberate intent to take a human life . . . ." Id. at 386 (jury instruction defining "malice aforethought"). Notably, Alverson has made no attempt to challenge the sufficiency of these findings in this federal habeas appeal.

*d) Co-defendant Harjo's role in the murder*

In the Ake section of his appellate brief, Alverson quotes language from the panel opinion in Wilson v. Sirmons, 536 F.3d 1064 (10th Cir. 2008), stating that co-defendant Harjo "'received a life sentence from the jury, presumably because of his youth, even though he [Mr. Harjo] was the one who beat the victim to death with a baseball bat . . . .'" Aplt. Br. at 43-44 (quoting Wilson, 536 F.3d at 1095).[10] Although Alverson does not rely on Wilson to support his claim that the evidence was insufficient to support the jury's finding of the "heinous, atrocious or cruel" aggravator, the quoted statement from Wilson nevertheless deserves at least brief discussion because the record in this case indicates that the statement is

---

[10] The quoted language from Wilson garnered the support of only Judge McConnell, the author of the majority opinion, and was not joined by Judge Hartz or Judge Tymkovich. See 536 F.3d at 1070 (noting that neither Judge Hartz nor Judge Tymkovich joined Part III(E) of Judge McConnell's opinion).

35

inaccurate.

The state trial court conducted two trials for the four co-defendants in this case: one trial for Alverson and Harjo, and one trial for Wilson and Brown. At the trial for Alverson and Harjo, the state presented uncontroverted evidence from police witnesses that they observed a significant amount of blood in the cooler area where Yost was murdered, including a pool of blood on the floor near his body and blood spatters on the walls and ceiling of the cooler. In turn, one police witness, Roy Heim, opined that the person who swung the bat at Yost would definitely have been splattered with blood. The state also presented testimony from Mandy Rumsey, who testified that she and a friend of hers stopped at the QuikTrip in the early morning hours of February 26, 1995. When Rumsey and her friend entered the store, they observed Wilson working the cash register, meaning that Yost, the victim, had at that point already been dragged into the cooler and beaten to death. Rumsey testified that, after remaining in the QuikTrip for approximately one hour, she and her friend left the store with Harjo and walked to some nearby apartments, where they remained for approximately thirty minutes before returning to the QuikTrip. On cross-examination by Harjo's counsel, Rumsey testified that she had an opportunity to clearly see everything Harjo was wearing, and she did not recall observing any blood or dark stains on his hands, face, shirt or trousers. On cross-examination by Alverson's counsel, Rumsey testified that she would not have been able to determine if there were

36

blood stains on Alverson's body or clothing. Considered together, this evidence may well explain why the jury imposed a sentence of death for Alverson, but not for Harjo. In particular, the jury could reasonably have inferred from this evidence that although Harjo carried the bat into the cooler, one of the other codefendants, including possibly Alverson, took the bat from Harjo and used it to strike and kill Yost.

   *C. Ineffective assistance of counsel - failure to investigate head trauma*

   Alverson next contends that his trial counsel, Jim Fransein, was constitutionally ineffective for failing to properly investigate and evaluate the head trauma that Alverson suffered as a child. In support of this claim, Alverson asserts that Fransein "knew before trial that . . . Alverson had suffered head injuries," but ultimately "failed to investigate the effects of" those injuries "on [Alverson's] behavior." Aplt. Br. at 53.

   *1) Applicable clearly established federal law*

   Alverson correctly notes that the "clearly established federal law" applicable to this claim is the Supreme Court's decision in Strickland v. Washington, 466 U.S. 668 (1984). In Strickland, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components." 466 U.S. at 687. "First," the Court noted, "the defendant must show that counsel's performance was deficient." Id. "This requires showing that counsel made errors

37

so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Id. "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense." Id. "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Id. "Unless a defendant makes both showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id.

### 2) OCCA's rejection of the claim

On direct appeal, Alverson asserted a multi-faceted claim of ineffective assistance of counsel. Included among his arguments was the following: "[T]here was evidence that defense counsel was aware that Billy Alverson had received a head injury in his youth. (O.R. 360) Given the fact that there is an established relationship between the existence of traumatic head injury and persons on death row, this is a factor in mitigation that should have been explored." State Aplt. Br. at 31. The OCCA rejected those arguments on the merits, stating:

> Finally, Alverson takes issue with counsel's failure to investigate alleged head injuries Alverson had received as a child. Counsel did request funds to hire an expert to look into this issue, which was properly denied by the trial court. Because Alverson has presented no evidence to support his contention that ordinary injuries he received as a child resulted in inorganic [sic] brain damage, we dispose of this claim on a lack of prejudice as well.

Alverson I, 983 P.2d at 511 (footnotes omitted).

38

*c) § 2254(d) analysis*

We conclude that the OCCA's rejection of Alverson's ineffective assistance claim was neither contrary to, nor an unreasonable application of, Strickland. With respect to the first prong of the Strickland test, the OCCA correctly noted that Alverson's trial counsel actually requested funds for a neuropsychological examination. Indeed, trial counsel made repeated attempts to obtain such funding. Notably, Alverson has not identified what other action his trial counsel could or should have taken. Thus, the OCCA reasonably concluded, under the first prong of the Strickland test, that trial counsel's performance was not deficient. As for the second prong of the Strickland test, the OCCA reasonably concluded, based on Alverson's failure to present any evidence establishing the probable existence of any organic brain damage (such as evidence of severe head trauma and/or sudden changes in behavior after such trauma), that Alverson could not establish prejudice arising from any asserted failure on the part of his trial counsel. And, again, Alverson has not, in his federal appellate brief, explained why the OCCA's determination in this regard was unreasonable.

To be sure, Alverson presented new evidence with his application for state postconviction relief, in the form of an affidavit from Dr. Philip Murphy, suggesting that he did, in fact, suffer from an organic brain disorder. Alverson did not, however, attempt to reassert the same ineffective assistance arguments he raised on direct appeal (and even if he had, the new evidence would presumably

39

not have altered the OCCA's analysis of the first <u>Strickland</u> prong).[11]  Thus, the

OCCA was never asked to reconsider its ruling in light of the new evidence.  To

the extent that Alverson's current reliance on that evidence "transform[s] his

ineffective assistance of counsel claim into one . . . significantly different," "more

substantial,"[12] and thus unexhausted, <u>Demarest v. Price</u>, 130 F.3d 922, 939 (10th

Cir. 1997) (internal quotation marks omitted), it in turn is clear "that, were

[Alverson] to attempt to now present the claim to the Oklahoma state courts in a

second application for post-conviction relief, it would be deemed procedurally

barred."  <u>Cummings v. Sirmons</u>, 506 F.3d 1211, 1223 (10th Cir. 2007).  "Thus,

the claim is subject to what we have termed an 'anticipatory procedural bar.'"  <u>Id.</u>

(quoting <u>Anderson v. Sirmons</u>, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007)).

Although Alverson has asserted claims of ineffective assistance of appellate

counsel, he has not, to date, asserted that appellate counsel was ineffective for

failing to obtain an affidavit from Murphy (or another psychologist) to support

the ineffectiveness claim that was actually asserted on direct appeal.  Nor could

Alverson claim that his state post-conviction counsel was ineffective for failing to

---

[11] Alverson instead argued, for the first time, that his trial counsel was ineffective for failing to seek and obtain ex parte hearings on his applications for funding for a neuropsychological examination.  That claim, however, is not at issue in this federal habeas appeal.

[12] It is doubtful that Murphy's affidavit substantially bolsters or transforms the claim in this manner, particularly given the fact that the jury rejected the continuing threat aggravator.

40

raise the claim, "because a defendant is not constitutionally entitled to representation by counsel in state post-conviction proceedings." Id.

## D. Cumulative error

Alverson contends that "the cumulative effect" of the errors asserted in his appellate brief "warrant habeas corpus relief in the form of a new sentencing proceeding." Aplt. Br. at 54. In the federal habeas context, "'[a] cumulative-error analysis aggregates all [constitutional] errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless.'" Brown v. Sirmons, 515 F.3d 1072, 1097 (10th Cir. 2008) (quoting United States v. Toles, 297 F.3d 959, 972 (10th Cir. 2002)).

Because we have rejected each of Alverson's substantive claims of constitutional error, there can be no cumulative error.

## E. Request for evidentiary hearing

Finally, Alverson contends the district court erred "by failing to hold an evidentiary hearing before concluding that proffered mitigation evidence was harmless." Aplt. Br. at 56 (all capitals in original modified to lower case). Alverson does not, however, identify which of his claims the proposed evidentiary hearing would have related to. Presumably, he is asserting the evidentiary hearing would have pertained to his Ake and Ake-related claims.

"Because [Alverson's] petition is governed by AEDPA, he can obtain an

41

evidentiary hearing in federal court [only] by (1) showing he was diligent in developing the factual basis for his claim in state court, 28 U.S.C. § 2254(e)(2) (2000); Williams v. Taylor, 529 U.S. 420, 429-31, 120 S.Ct. 1479, 146 L.Ed.2d 435 (2000), and (2) asserting a factual basis that, if true, would entitle him to habeas relief . . . ." Sandoval v. Ulibarri, 548 F.3d 902, 915 (10th Cir. 2008). "Consistent with this standard, 'an evidentiary hearing is unnecessary if the claim can be resolved on the record.'" Id. (quoting Anderson v. Att'y Gen. of Kan., 425 F.3d 853, 859 (10th Cir. 2005)).

Even assuming Alverson was diligent in developing the factual basis of his claims in state court, he "has not shown that an evidentiary hearing would have aided his cause." Id. In particular, in resolving Alverson's Ake and Ake-related claims, there are no unresolved issues of fact to be determined. Rather, those claims hinge on the application of clearly established law to an uncontroverted set of facts. Thus, there was no need for a federal evidentiary hearing.

The judgment of the district court is AFFIRMED.

42

*Alverson v. Workman*, No. 09-5000

**TYMKOVICH**, J., concurring.


Although I agree with Judge Briscoe's merits analysis, in my view we must apply the independent and adequate state ground doctrine to the *Ake* claims.[1] When reviewing a state prisoner's petition for a writ of habeas corpus, federalism and comity require us to respect and give effect to state procedural rules. Because Alverson failed to raise a claim based on *Ake v. Oklahoma*, 470 U.S. 68 (1985), on direct appeal—and because the Oklahoma Court of Criminal Appeals relied upon a state procedural law to dispose of the *Ake* claim on post-conviction review—we are barred from considering the claim.

## I.

The Supreme Court has never suggested we may ignore a state procedural law if it is raised defensively in federal habeas litigation. To the contrary, the Court has compared state procedural bars to limits on federal judicial power:

> Without the [independent and adequate state ground
> doctrine], a federal district court would be able to do in
> habeas what this Court could not do on direct review;
> habeas would offer state prisoners whose custody was
> supported by independent and adequate state grounds an
> end run around the limits of this Court's jurisdiction and

---

[1] I join in all but Part III.A.4. Regarding the merits of Alverson's claim under *Ake v. Oklahoma*, 470 U.S. 68 (1985), I entirely agree with Judge Briscoe that the state court did not unreasonably apply federal law in disposing of the claim, nor did it adjudicate the claim in a manner contrary to federal law. *See* 28 U.S.C. § 2254(d)(1).

> a means to undermine the State's interest in enforcing its
> laws.

*Coleman v. Thompson*, 501 U.S. 722, 730–31 (1991). According to the Court, the doctrine is "grounded in concerns of comity and federalism," *id*. at 730, which prevent us from reaching the merits when the last state court to address a claim "fairly appears" to rest its judgment on a state procedural rule. *See id*. at 740.

We have previously acknowledged the foundational importance of the independent and adequate state ground doctrine, stating that it "implicates important values that transcend the concerns of the parties to an action." *Hardiman v. Reynolds*, 971 F.2d 500, 503 (10th Cir. 1992). Indeed, because of the doctrine's importance, we have held that "a federal habeas court can always raise procedural bar *sua sponte*." *Romano v. Gibson*, 239 F.3d 1156, 1168 (10th Cir. 2001); *see also Cummings v. Sirmons*, 506 F.3d 1211, 1223 (10th Cir. 2007) (describing the doctrine of "anticipatory procedural bar"). Here we need not raise the Oklahoma procedural bar *sua sponte*, as the question of procedural default was squarely raised below and was raised again on appeal to this court. But our willingness to apply an applicable state procedural bar—even where the state court has not had the opportunity to do so—underscores the important role state procedural law plays in federal habeas review.

In Oklahoma capital cases, only claims that "[w]ere not and *could not* have been raised in a direct appeal" are eligible for state collateral review. 22 Okla. Stat. Ann. § 1089(C)(1) (1999) (emphasis added). When it disposed of

2

Alverson's post-conviction petition, the OCCA held that Alverson's *Ake* claim "could have been raised on direct appeal but [was] not," and it was therefore "waived" under state law. *Alverson v. Oklahoma*, No. PC 98 1182, Slip Op. at 3 & n.7 (Okla. Ct. Crim. App. July 19, 1999) (unpublished) (citing § 1089(C)(1)). Relying upon this holding by the OCCA, the government has consistently argued Alverson's failure to comply with state procedural law prevents review of the *Ake* claim in federal court.

Judge Briscoe does not really take issue with the OCCA's finding of waiver. She acknowledges that on direct appeal, Alverson "did not challenge the state trial court's denial of his [*Ake*] application," and he failed to mention or cite *Ake* to the OCCA. Maj. Op. at 15. And even Alverson himself conceded his *Ake* claim was not properly presented to the OCCA—in the district court, he alleged his appellate counsel was ineffective for failing to raise the claim on direct appeal.[2]

Nonetheless, because on direct appeal the OCCA mentioned that no evidence supported an *Ake* claim while denying Alverson's ineffective assistance claim—and referred to *Ake* in an alternative holding on collateral review— Judge Briscoe contends the state procedural bar has been overridden. In light of Supreme Court precedent, however, I disagree with this contention.

---

[2] As his counsel noted at oral argument, Alverson has since abandoned his ineffective assistance of appellate counsel claim.

3

First, the Supreme Court has directed us to look to the *last* state court decision disposing of a federal claim, and not some intermediate decision, to determine whether the claim is procedurally barred. *See Coleman*, 501 U.S. at 735 (quoting *Harris v. Reed*, 489 U.S. 255, 263 (1989)). Only if the last state court opinion to address the claim ignores the procedural bar and reaches the merits may we follow suit. *See Ylst v. Nunnemaker*, 501 U.S. 797, 801 (1991) ("If the last state court to be presented with a particular federal claim reaches the merits, it removes any bar to federal-court review *that might otherwise have been available*." (emphasis added)).[3] Here, the last state court to address the *Ake* claim explicitly rested its judgment on an Oklahoma procedural rule.

Second, the Supreme Court requires us to give effect to a state procedural bar even when the state court reaches the merits of a federal claim in an alternative holding. *See Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989). In *Harris*, the Supreme Court imported to the habeas context the "plain statement" rule of *Michigan v. Long*, 463 U.S. 1032 (1983), a seminal case on the boundaries

---

[3] Even so, a state court cannot prevent federal review of a constitutional claim merely by talismanically invoking a state procedural rule. If the state procedural law is somehow inadequate as a federal matter—for example, if it deprives a habeas petitioner "of any meaningful review" of his constitutional claim—the independent and adequate state ground doctrine is inapplicable and we may reach the merits. *Hooks v. Ward*, 184 F.3d 1206, 1214 (10th Cir. 1999) (quoting *Brecheen v. Reynolds*, 41 F.3d 1343, 1364 (10th Cir. 1994)); *see also Phillips v. Ferguson*, 182 F.3d 769, 773 (10th Cir. 1999) ("[I]f it is determined that the state post-conviction procedure is unconstitutional, then such procedures would not, in most instances, be regarded as an adequate state procedural bar to habeas consideration of the underlying conviction.").

of the Court's power to review state court judgments. Under that rule, a federal court may not reach a habeas petitioner's constitutional claims if "the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on a state procedural bar." *Harris*, 489 U.S. at 263 (quoting *Caldwell v. Mississippi*, 472 U.S. 320, 327 (1985)).

According to *Harris*, the plain statement rule applies even under the circumstances presented in this case, where the state court addressed the merits of the federal claim in addition to finding it waived. As the Supreme Court held, "a state court need not fear reaching the merits of a federal claim in an *alternative* holding." *Harris*, 489 U.S. at 264 n.10 (emphasis in original).[4] Thus, a federal court is barred from considering "a federal issue on federal habeas as long as the state court explicitly invokes a state procedural bar rule as a separate basis for decision." *Id.*; *see also Sochor v. Florida*, 504 U.S. 527, 534 (1992) ("[T]he rejection of [the habeas petitioner's] claim was based on the alternative state ground that the claim was 'not preserved for appeal' . . . . Hence, we hold

---

[4] Other circuits have repeatedly enforced the "alternative holding" rule set forth in *Harris*. *See, e.g.*, *Stephens v. Branker*, 570 F.3d 198, 208 (4th Cir. 2009); *Campbell v. Burris*, 515 F.3d 172, 177 & n.3 (3d Cir. 2008) (noting that whether the state court "actually reviewed" the merits of a petitioner's federal claims is irrelevant if the state court "expressly relies on a state procedural rule" to dispose of the claims), *cert. denied*, 129 S. Ct. 71; *Brooks v. Bagley*, 513 F.3d 618, 624 (6th Cir. 2008) (citing *Harris*, 489 U.S. at 264 n.1), *cert. denied*, 129 S. Ct. 1316 (2009); *Taylor v. Norris*, 401 F.3d 883, 886 (8th Cir. 2005) ("Although the Arkansas Supreme Court, in its footnote 1, set forth an alternative ruling based on the merits . . . the court nevertheless clearly and expressly stated that its decision rested on state procedural grounds.").

5

ourselves to be *without authority* to address Sochor's claim . . . ." (emphasis added)).

Here, the OCCA indeed "explicitly invoked" a state procedural rule to deny the *Ake* claim on post-conviction review. *Harris*, 489 U.S. at 264 n.10. Moreover, the OCCA's discussion of the merits of the *Ake* claim on post-conviction review (if not on direct appeal) was most certainly framed in the alternative: the OCCA stated in a footnote—after concluding in the text that the *Ake* claim was waived—that "[i]n any event, the trial court's denial of a neurological *Ake* expert was proper." *Alverson*, No. PC 98 1182, Slip Op. at 3 n.7.[5] Because this holding was framed in the alternative, it did not eviscerate the procedural bar the OCCA simultaneously—and explicitly—invoked to dispose of the *Ake* claim.

## II.

Judge Briscoe cites three decisions from outside the Tenth Circuit that appear to allow us to reach Alverson's *Ake* claim despite the holdings in *Coleman*

---

[5] The Second Circuit has attempted to draw a distinction between "alternative" holdings and "contrary-to-fact" holdings. *See Bell v. Miller*, 500 F.3d 149, 155 (2d Cir. 2007) (holding that the language, "*if* the merits *were* reached, the result *would be* the same," is a contrary-to-fact holding, not an alternative holding (emphasis in original)). Although I do not adopt that distinction, here the OCCA no doubt made an alternative holding on post-conviction review when it utilized the prefatory phrase "in any event" before addressing the merits of the *Ake* claim. *See Sochor*, 504 U.S. at 534 (holding that the portion of a state court opinion following the phrase "in any event" is an alternative holding).

and *Harris*. According to Judge Briscoe, those decisions conclude that "a state appellate court's *sua sponte* consideration of an issue not only satisfies § 2254's *exhaustion requirement* but ... also constitutes an adjudication on the merits that is ripe for federal habeas review." *See* Maj. Op. at 21 n. 3 (emphasis added) (citing *Comer v. Schriro*, 480 F.3d 960 (9th Cir. 2007); *Walton v. Caspari*, 916 F.2d 1352 (8th Cir. 1990); *Cooper v. Wainwright*, 807 F.2d 881 (11th Cir. 1986)). For several reasons, I believe those cases do not apply here.

As an initial matter, the doctrine of exhaustion and the doctrine of independent and adequate state grounds are distinct. Exhaustion is a creature of federal statute and is a mandatory prerequisite to federal habeas review. *See* 28 U.S.C. § 2254(b)(1)(A). The independent and adequate state ground doctrine, on the other hand, is based upon the limits of federal jurisdiction contained in Article III of the Constitution, and is meant to give effect to state procedural rules. *See Coleman*, 501 U.S. 730–31; *Harris*, 489 U.S. at 262–63. Although the two doctrines may sometimes appear to be intertwined, they are not identical. *See Hawkins v. Mullin*, 291 F.3d 658, 663–64 (10th Cir. 2002) (separately analyzing procedural bar and exhaustion); *see also Coleman*, 501 U.S. at 731 (discussing the doctrine of exhaustion and state procedural default separately, but noting they both implicate the principles of comity).

Thus, to the extent the cases cited by Judge Briscoe address whether a federal claim has been *exhausted*, those cases are inapplicable to Alverson's *Ake*

7

claim. *See Comer*, 480 F.3d at 984 ("[W]e will . . . consider a claim to be *exhausted* . . . if . . . the state court mentions it is considering the claim *sua sponte*." (emphasis added)); *Walton*, 916 F.2d at 1357 ("[W]e hold that [the petitioner] *exhausted* his state remedies . . . ." (emphasis added)). The government does not seriously dispute Alverson's *Ake* claim has been exhausted—he clearly attempted to raise it in his petition for post-conviction relief. The question is whether it was presented in compliance with Oklahoma procedural rules. For the reasons given above, it was not.

Furthermore, the Eleventh Circuit's 1986 holding in *Cooper* conflicts with and predates the Supreme Court's 1989 and 1991 holdings in *Harris* and *Coleman*, and we should not adopt *Cooper* as the law of the Tenth Circuit. In *Cooper*, the court reviewed a Florida prisoner's habeas petition. In a state collateral proceeding, the Florida Supreme Court had ruled that a state procedural rule prevented the prisoner from asserting one of his federal claims. *Cooper*, 807 F.2d at 885. Nonetheless, an earlier decision by the Florida Supreme Court had *sua sponte* "recognized and passed on the [federal] claim," and the Eleventh Circuit determined that it could therefore review the claim on the merits. *Id*. at 886.

Thus, *Cooper* contravenes the Supreme Court's explicit instruction to examine the "decision of the *last* state court to which the petitioner presented his federal claims." *Coleman*, 501 U.S. at 735 (emphasis added); *see id*. at 735–36

8

(quoting *Harris*, 489 U.S. at 263); *see also Ylst*, 501 U.S. at 801. *Cooper* relied not on the *last* decision of the Florida Supreme Court, but on an *intermediate* decision—the decision disposing of the prisoner's *direct appeal*. *See Cooper*, 807 F.2d at 884 (referring to the two state court decisions as "*Cooper I*" and "*Cooper II*"). We should not apply the erroneous conclusion in *Cooper* to the case at hand and thereby taint our own circuit's precedent.[6]

### III.

Judge Briscoe also cites several cases from this circuit in support of reaching the merits. She notes "[t]his is by no means the first time we have reached the merits of a § 2254 claim that was first considered on the merits by a state appellate court and then later rejected by that same court as procedurally barred." Maj. Op. at 22–23 & 22 n.4 (collecting cases). Each of the cited cases, however, presented unique procedural or other questions that do not pertain here. Indeed, we have never held that we may ignore a procedural bar *explicitly invoked* by a state court, when neither party suggests the procedural bar is somehow inapplicable or infirm as a matter of federal law.

---

[6] Of course, if a state court conspicuously refuses to invoke a potentially-applicable state procedural rule, and instead addresses a federal claim on the merits, a federal court has "no concomitant duty to apply [the] state procedural bar[]." *Cone v. Bell*, 129 S. Ct. 1769, 1782 (2009). This remains true so long as no later state court decision suggests a valid procedural default might apply. *See id.* But here, as in *Cooper*, the last state court to address the relevant federal claim explicitly relied upon a state procedural law. *Coleman* and *Harris* therefore require us to respect the decision of the OCCA and avoid addressing the merits of Alverson's *Ake* claim.

9

For example, one of the cases, *Mathis v. Bruce*, 148 F. App'x 732 (10th Cir. 2005), merely denied relief on the merits to avoid a "procedural morass" that we would otherwise have been required to untangle. *Id*. 735. We have followed this procedure many times in the past—a point not lost on Judge Briscoe, who cites additional cases to that effect. *See* Maj. Op. at 22 n.4; *see also Revilla v. Gibson*, 283 F.3d 1203, 1214 (10th Cir. 2002) ("[W]e elect to avoid complex procedural bar issues and resolve the matter 'more easily and succinctly' on the merits." (quoting *Romero v. Furlong*, 215 F.3d 1107, 1111 (10th Cir. 2000))).

In denying a claim on the merits instead of addressing a "thorny" and "complex" state procedural question, we do no violence to the doctrine of independent and adequate state grounds. *See Revilla*, 283 F.3d at 1210–11. Indeed, we actually honor the doctrine by declining to address difficult questions of state law that are more properly the province of the state courts. Here, however, the issue of whether Alverson's *Ake* claim is procedurally barred is not particularly difficult. The merits question, on the other hand, is more complicated, as evidenced by Judge Kelly's thoughtful dissent.

The other cases, *Johnson v. Champion*, 288 F.3d 1215 (10th Cir. 2002), and *Sallahdin v. Gibson*, 275 F.3d 1211 (10th Cir. 2002), likewise do not apply to Alverson's *Ake* claim. In *Johnson*, we *excused* an otherwise valid state law procedural bar because we concluded the habeas petitioner had shown "cause and prejudice" for his failure to comply with applicable state procedural rules.

10

*Johnson*, 288 F.3d at 1226–27; *see also id.* ("Generally speaking, this court 'does not address issues that have been defaulted in state court on an independent and adequate state procedural ground, *unless* the petitioner can demonstrate *cause and prejudice* or a fundamental miscarriage of justice.'" (emphasis added) (quoting *English v. Cody*, 146 F.3d 1257, 1259 (10th Cir. 1998))). In *Sallahdin*, we addressed the merits of a constitutional claim because the OCCA had given the petitioner permission to raise it on direct appeal, yet inexplicably failed to address the claim. 275 F.3d at 1227.

Here, nothing in the record suggests the procedural bar the OCCA invoked is somehow inapplicable. We have previously held that the Oklahoma procedural bar at issue is "independent and adequate" as a matter of federal law when applied to claims based on *Ake*, and Alverson has not argued otherwise. *See Smith v. Workman*, 550 F.3d 1258, 1267 (10th Cir. 2008) ("We agree that Petitioner's substantive *Ake* claim is procedurally barred given that the OCCA deemed the claims waived on an independent and adequate state law ground . . . because it was not raised on direct appeal."), *cert. denied*, 130 S. Ct. 238 (2009). And Alverson does not assert that an exception to the independent and adequate state ground doctrine applies. That is, he has not alleged cause for his failure to comply with state law, that the state procedural law actually prejudiced him, or that he is factually innocent and a "fundamental miscarriage of justice" will occur if the procedural bar is enforced. *See Ellis v. Hargett*, 302 F.3d 1182, 1186 & n.1

11

(10th Cir. 2002) (discussing the exceptions to the independent and adequate state ground doctrine).

Thus, nothing in our case law—including the cases invoked by Judge Briscoe—suggests we are free to disregard the OCCA's state law disposition of Alverson's *Ake* claim.

*        *        *

Supreme Court precedent commands us to respect the OCCA's conclusion that Alverson waived his *Ake* claim when he failed to present it on direct appeal. Nothing in the record suggests the procedural rule the OCCA applied is somehow infirm, and Alverson has not argued he is eligible for an exception to the independent and adequate state ground doctrine. To honor the principles of federalism and comity that underlie our habeas corpus jurisprudence, we must heed *Coleman* and *Harris*, and allow the OCCA's state law decision to stand.

No. 09-5000, <u>Alverson v. Workman, Warden, Oklahoma State Penitentiary</u>

**KELLY**, Circuit Judge, concurring in part and dissenting in part.

I concur in the court's opinion except for Part III(A)(5), the <u>Ake</u> claim.

As to that part, I must dissent.

To execute a person because he could not come up with the $2,050 to employ an appropriate mental health expert plainly violates due process.

<u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), is clear. When a defendant *ex parte* shows that his "mental condition" may well be a "significant factor" at sentencing, the defendant has the "readily apparent" due process right to "a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense." <u>Ake</u>, 470 U.S. at 82-83.

Mr. Alverson merited expert assistance under <u>Ake</u>, and the state trial court properly authorized $750 for Jean Carlton, a social worker. Ct. Op. at 25. But *after* Ms. Carlton identified symptoms of a major brain disorder, the trial court wrongly rejected Mr. Alverson's requests for funds for a neuro-psychologist.

That Ms. Carlton was not competent to diagnose brain injury did not negate Mr. Alverson's showing of need for testing. Mr. Alverson's counsel submitted Ms. Carlton's evaluations because they raised strong suspicions of brain disorder, and he had no other way to prove Mr. Alverson's need for further investigation. 1 State Tr. at 26 (transcripts); 2 State R. at 328 (pleadings).

The State demanded more evidence.  But it withheld the funds that would enable Mr. Alverson to provide it.  Requiring a defendant to prove, in advance, what he needed the money to prove gets it backwards.

Ms. Carlton's competence or incompetence can only factor in favor of granting funds.  Either Ms. Carlton was incompetent, such that reliance upon her alone violated Mr. Alverson's right to a competent expert, or she was competent, such that her recommendation merited funds for a neurological expert.  Ake, 470 U.S. at 78-79.  And if her reports were insufficient, surely the neuro-psychologist's recommendation for testing, submitted *pro bono* and as a concerned citizen, made the minimal showing of need.  2 State R. at 358, 360.  Silent records cannot cancel out these suspicions.

It is clear that the trial judge ignored Mr. Alverson's experts.  He denied funds because he personally did not note any signs of mental deficiency while Mr. Alverson was in court.  4 State Tr. at 57, 63; 5 State Tr. at 4.

That the trial judge could not diagnose neurological disorders from the bench is a totally improper and insufficient basis to deny the modest funds needed to properly defend an indigent defendant.[1]  1 State Tr. at 28-29.  Though this

---

[1]  In an intervening case between Mr. Alverson's trial and his direct appeal, the OCCA reaffirmed that Ake required provision of the requested services and criticized the same trial judge for using this illegal heightened showing standard. Fitzgerald v. State, 972 P.2d 1157, 1166-68 (Okla. Crim. App. 1998).  The OCCA apparently ignored this precedent when it jumped to decide this issue without the benefits of briefing or a full recitation of facts.  Alverson v. State, 983 P.2d 498,

(continued...)

-2-

court suggests that the state trial court considered several other sources in denying the additional funds, these sources simply cannot negate the suspicions raised and the need for further investigation by a competent and qualified professional neuro-psychologist.  Thus, this court's comment that neither Mr. Alverson nor the dissent have addressed the rationale of the OCCA in upholding the denial of funds is not correct–the findings of the OCCA cannot justify its result.

The federal district court also concluded that the violation did not have "substantial and injurious effect or influence in determining the jury's [death penalty] verdict," Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), because (1) the jury rejected Mr. Alverson's future dangerousness as an aggravating factor and (2) any mitigating evidence that could have resulted from a neurological examination would not have affected the jury's finding of the other two aggravating factors.  Alverson v. Sirmons, No. 00-CV-528-TCK-SAJ, 2008 WL 5122348, at *10-12 (N.D. Okla. Dec. 5, 2008).  This overlooks that Mr. Alverson merited an expert's aid (1) to demonstrate his culpability for the crime, (2) to disprove the two aggravating factors implicating his mental state, (3) to mitigate against a death sentence, and (4) to help the jury decide upon a final sentence.

---

[1](...continued)
511 (Okla. Crim. App. 1999).

This court apparently agrees with the State's observation that the trial court only denied "additional" evaluation and that Ms. Carlton adequately testified. Ct. Op. at 13-15, 25, 29; Aplee Br. at 29-30, 34-35. This observation is patently incorrect.

On cross examination, the State revealed that Ms. Carlton was so unqualified and incompetent that her testimony said nothing whatsoever about Mr. Alverson's psychology. 9 State Tr. at 176-219; 10 State Tr. at 37. The State marched through a harrowing list of Mr. Alverson's mental and personality traits, and Ms. Carlton agreed time after time that these traits were psychopathic. 9 State Tr. at 203-219, 230-232. Besides this "adequate" testimony, Mr. Alverson had no mitigating case to speak of. 3 State R. at 422.

On the one hand, the State holds up the social worker's initial evaluation as "proof" that Mr. Alverson received the help he needed. On the other hand, the State went to great lengths to convince the jury that Ms. Carlton was totally inept and unqualified. All this is doublespeak, merely to save the State a few dollars and to ensure that the jury would sentence Mr. Alverson to death as a psychopath.

If Mr. Alverson had received a competent evaluation, he very well could have presented evidence that he was not a psychopath and that he suffered from an undiagnosed organic brain disorder reducing his culpability for his behavior. Affidavit of Dr. Philip J. Murphy, Application for Post-Conviction Relief at Ex. 5, Alverson v. State, No. PC-98-1182 (Okla. Crim. App. April 26, 1999). This

evidence would have provided Mr. Alverson a mitigation case and could well have tipped the scales in a jury's choice of a final sentence.

If Oklahoma is going to continue to seek to exact the ultimate punishment, it ought to pay the cost of ensuring that it does not carry out its quest for vengeance on a person who, with appropriate assistance, might be spared.

I would remand the case to the district court with instructions to conditionally grant the writ.